JOURNAL ENTRY AND OPINION
JAMES M. PORTER, A.J.:
Defendant-appellant Edward Code appeals from his conviction following a jury trial in Common Pleas Court for voluntary manslaughter (R.C. 2903.03). Defendant contends since the jury found him not guilty of murder, he could not be convicted of voluntary manslaughter, an offense of an inferior degree; that the trial court erred in giving confusing and illegally incorrect instructions to the jury; and that the evidence was not sufficient to convict defendant of the crime and was against the manifest weight of the evidence. We find no error and affirm.
This case arose out of the stabbing death of Edilberto Reyes following a bar fight on October 31, 1997 in Cleveland. The evidence at trial is summarized below.
Robert Challener of the Coroner's Office testified that the autopsy of the alleged victim, Edilberto Reyes, revealed blunt force injuries and stab wounds near his chest and neck which resulted in his death. Toxicology tests on the victim's blood revealed a .27 percent concentration of alcohol and a .011 percent concentration of cocaine.
Challener examined a serrated knife (State's Ex. 5) recovered at the scene with the blade measuring four inches in length. Challener testified that the stab and incision wounds on the victim's body were "certainly consistent" with wounds to be anticipated from that knife.
Carmen Dias testified that she had known the victim for over twenty years and once considered marrying him. She had met defendant two months prior to the stabbing death and had occasionally stayed with defendant in his apartment at West 75th Street and Lorain Avenue. This apartment was directly above Peter's Pub, the location of the bar fight and the scene of the victim's stabbing on October 31, 1997.
Ms. Dias testified that she went to Peter's Pub on the night of October 31, 1997, at around 8:30 or 9:00 p.m. with the victim. The victim conversed with the defendant while at the bar. Soon after they entered the bar, Dias claimed that the drunk female bartender jumped onto the bar and began screaming at Dias "I don't want you here." Two men then escorted Dias outside because she was "getting upset, and stuff." Dias, along with the two men, proceeded to the Red Pepper Lounge at West 65th and Lorain. After one drink at the Red Pepper Lounge, Dias testified that she returned to Peter's Pub to find the victim.
When she returned to Peter's Pub, she was attacked by a woman who punched and pushed her into the street. This incident occurred at approximately 10:00-10:30 p.m. She sustained a "busted lip" and bruises from this attack. After she got up after being knocked down during the altercation, she went across the street to visit a friend, but he was not home. She then noticed the victim walking down Lorain Road. She noticed that he was drunk and asked him to take her home. The victim declined and informed her that he wanted to go back to Peter's Pub. Dias testified that neither she nor the victim was angry as they headed back to Peter's Pub.
According to Dias, when they re-entered the bar, the victim walked up to defendant and, without saying a word, slapped him. Defendant then began punching the victim, who did not defend himself and the altercation spilled outside onto the street.
The victim fell to the pavement on his back and defendant straddled him continuing to strike the victim. Dias pushed defendant away and saw blood on the victim's face. Dias testified that she panicked and ran away to the victim's father's house several blocks away. She did not see a knife or weapon at the scene.
Dias testified that 911 was called while she was at the house and about half an hour later, she was taken into custody by the Cleveland Police and placed in a cell where she fell asleep. The police then brought her downtown where she was questioned and her clothes were confiscated. During her testimony, she identified several items of clothing worn by her and the victim on October 31, 1997, as well as photographs which showed cuts on her hands. She testified that she did not have these cuts when she walked into Peter's Pub with the victim, but she remembered breaking a window at her friend's house after she ran from the scene and before she arrived at the victim's father's house.
On cross-examination, Dias acknowledged that she had several beers that night and the reason she was attacked initially by a woman at the bar was because the woman accused Dias of spitting on her. Dias reiterated that she saw no knife in the hands of anyone that night and that she had never before seen State's Exhibit 5, the serrated knife.
Tracy Savage testified for the State that on October 31, 1997, she lived in an apartment above Peter's Pub. She was good friends with defendant since they lived in the same building and she arrived at Peter's Pub that night at about 10:00-10:30 p.m. with defendant. While at the bar, she got into a fight with Dias, who called her a "bitch" and tried to spit on her. Savage testified she hit Dias about five times and knocked her down in the street. Later, Dias and the victim returned to the bar and the victim walked up to defendant and struck him. Subsequently, Dias and the victim then jumped on defendant as the fight spilled outside. She saw no weapons at this time. Savage walked outside and saw defendant on top of the victim. Savage testified that when the defendant got off of the victim, she saw a knife in defendant's hands and saw him drop the knife in a nearby sewer drain. Dias was no longer at the scene. Savage testified that she had never before seen State's Exhibit 5, the serrated knife. She visited defendant twice after his arrest.
On cross-examination, Savage testified that the victim's initial blow to defendant inside the bar was a closed-fisted punch to the face. She never saw defendant stab the victim, but she did see defendant punching the victim. She also saw the defendant kick the victim once in the head.
Nancy Russell testified that she lived across the street from Peter's Pub on October 31, 1997. She heard commotion outside late that night; she saw at least 30 people outside of the bar cheering. She called the police. When the crowd broke up, she saw the victim on the ground with blood all over him and a hysterical woman running away. She testified that she saw the victim try to get up, but the defendant kicked him in the face at least four or five times knocking him back down. She immediately called 911 and then ran to help the victim. Shortly after the police arrived and as they tried to stop the victim's throat from bleeding, she heard the defendant say "f___ him. I'm bleeding to death." She described the defendant as drunk and "non-caring" about the victim.
Joseph Watkins also lived across the street from Peter's Pub. He introduced Dias to defendant weeks before this incident. He stepped off of a bus in front of his apartment at 11:20 p.m. that night. He noticed a dozen people standing outside of the establishment. He crossed the street and then saw a body lying on the ground, covered in blood. He spoke with defendant who could not remember how he had been cut, but remembered fighting with the victim. Watkins saw no knife that night.
John Minadeo, M.D. testified that, as a resident physician at MetroHealth Medical Center, he examined and treated defendant in the early morning hours of November 1, 1997. Defendant had a 1.5 centimeter laceration on his left wrist. Dr. Minadeo testified that during his treatment, defendant told him that he thought the laceration was sustained by a knife, but he was not sure. Defendant did not appear to be intoxicated.
Sylvester Savage also lived in an apartment above Peter's Pub. He observed from his apartment window a fight between his daughter, Tracy, and another woman. Mr. Savage went downstairs to see what was happening. He then entered the bar where he stayed for awhile. Several minutes later, he observed the victim and Dias enter the bar and the victim strike defendant with a closed fist. He recognized Dias as the woman fighting with his daughter, Tracy, in the street a few minutes earlier. As they entered, defendant held his hands up in front of them to prevent them from coming any further into the bar. Mr. Savage testified that he then saw defendant and the victim exchange words and the victim hit the defendant in the head. It appeared that defendant had something in his hands, but he could not see what it was. He testified that he thought it may have been a knife, but he "couldn't tell if it was a knife or a key or what." When Mr. Savage went outside four or five minutes later, he saw the defendant bleeding and blood all over the victim lying in the street. Mr. Savage testified that he had never seen the serrated knife (State's Ex. 5) before trial. He further testified that Dias, the defendant and the victim all looked intoxicated to him.
Charles Naujoks testified that on October 31, 1997, he was at Peter's Pub where he took over bartending duties for his girlfriend, Danielle Grabovic, who went home sick. Defendant frequented the bar and would walk the women home at night when they worked late. Naujoks saw the victim and Dias walk into the bar and the victim "sucker punch" the defendant. He testified that the defendant fought back and the fight spilled outside. Moments later, defendant came back in with blood spurting out of his arm. Naujoks saw no knife that night and has never before seen State's Exhibit 5. On cross-examination, Naujoks revealed that he had served Dias a couple of shots of liquor earlier that evening and that defendant had paid for the shots.
Cleveland Police Officer Kristin Oravec testified that she responded to a call at Peter's Pub about 11:28 p.m. that night. When she arrived, she observed fifteen to twenty males, several of them beating the victim. She was met by defendant who was yelling and screaming that he was hurt and asked for medical attention for a wound to his arm. She then saw the victim in the street, but the defendant kept trying to distract her from going over to the victim by telling her how terribly he was hurt. After defendant continued antagonizing her, she said "Mr. Code, I understand you are bleeding. This man looks like he is bleeding to death. Would you please stand there and wait?" Officer Oravec interviewed the defendant at the scene, but defendant "was avoiding answering questions at that point" and was intoxicated. After defendant was treated, he was booked and interviewed by homicide detectives. Officer Oravec conveyed Carmen Dias to the homicide division for questioning and she was taken into custody. Oravec testified that both defendant and Dias were arrested and were murder suspects.
Cleveland Police Officer Michael Beaman of the Homicide Unit testified that on November 1, 1997, he assisted a Cleveland water department truck with debris taken from a sewer outside of Peter's Pub. Beaman testified that he observed a large vacuum suck debris from the sewer. A serrated steak knife (State's Ex. 5) was found in the sewer debris.
Tina Wolf, a scientific examiner with the Cleveland Police Department's Scientific Investigation Unit (S.I.U.), received State's Exhibit 5 for testing on November 7, 1997. The preliminary test for blood came back positive, but she could not positively determine whether there was blood on the knife. She further testified that water could wash away any presence of blood. Edward Prinz, an officer with the S.I.U., tested State's Exhibit 5, but found no fingerprints. He testified that running water would tend to wash fingerprints away leaving no latent prints. Kristin Koeth, a scientific examiner with the S.I.U., tested the hands of defendant and Dias for trace metals, without positive results. However, she acknowledged that the handle on State's Exhibit 5 looked like plastic which would not have transferred any trace metal ions.
Sharon Rosenberg of the Cuyahoga County Coroner's Trace Evidence Laboratory, testified that she took several photographs and performed numerous tests relating to the case. On cross- examination, Rosenberg testified that the "slits" in the victim's shirt were stabbing-type defects produced by a sharp edged item. Rosenberg testified that State's Exhibit 5, with a serrated edge, would not have made sharp, clean cuts, but would have produced a "saw-like" ripping defect in the clothing. She also testified that a further view of one of the vertical slits in the shirt showed the possibility of a "saw toothed effect." She felt that the skin of the victim showed more serration than the clothing.
Kay May, an examiner with the Trace Evidence Laboratory of the County Coroner's Office, testified that she tested various DNA samples involved in this case. Her tests revealed the following:
Dias's boots worn on October 31, 1997 tested positive for Dias's and defendant's blood. Dias's pants tested positive for Dias's and the victim's blood. Defendant's jeans tested positive for an undetermined commingling of blood. Defendant's outer shirt tested positive for defendant's and Dias's blood. Defendant's undershirt tested positive for the victim's blood. Defendant's boots tested positive for his and the victim's blood. Dias's jacket tested positive for defendant's blood. Dias's shirt tested positive for Dias's and defendant's blood. May also tested State's Exhibit 5 and found it to be positive for the presence of blood and positive for human protein, but not enough DNA for testing.
Det. Robert Kuenzel of the Homicide Unit was assigned to investigate the death of the victim, Edilberto Reyes, on October 31, 1997. Kuenzel interviewed defendant who told him the victim attacked him and the fight spilled outside into the street. Defendant told Kuenzel that he believed someone threw a glass or beer bottle into the mix which caused defendant's injuries. Thereafter, the State rested. Defense counsel's motion for acquittal was denied.
Danielle Grabovic testified for the defense that she was tending bar at Peter's Pub on the night of October 31, 1997. Dias entered the bar around 7:00 p.m. with a beer in her hand. Grabovic told Dias that she was not serving her and ordered her to leave. Grabovic testified that Dias was "smashed, drunk." Grabovic testified that defendant would walk the ladies to their cars after closing time. That he would come into the bar regularly, have two drinks, then leave. She testified that she left work sick at about 9:00 p.m. and did not see any of the incidents that occurred later, as she never came back to the bar that night.
The defense's second witness, Joseph Davis, testified that he lived and worked across the street from Peter's Pub on the night of October 31, 1997. He observed defendant and the victim in a fight and that several young kids arrived and kicked the victim. Davis testified that he did not see any objects in defendant's hands.
Ron Davis testified that on October 31, 1997, he was working at his father's bar, the Royal Cafe, located down the street from Peter's Pub at 9724 Lorain Road. Davis testified that Dias came to his father's bar three or four times that night. The last time she arrived with blood on her hands, ranting in Spanish and Davis refused her admission to the bar. Dias then started cussing and walked away. Davis described Dias as upset and screaming.
Defendant himself testified that he went downstairs to Peter's Pub at approximately 8:00 p.m. on October 31, 1997. He spoke with the victim whom defendant considered to be a friend. Defendant testified that when the victim first left the bar he was "blitzed, drunk." Dias and the victim returned again after Dias's fight with Tracy Savage. Defendant testified that he stood up and told them that there was not going to be any trouble in the bar and no fighting was allowed, but then the victim punched him in the face. Defendant grabbed both Dias and the victim "like a bear hug" and pushed them outside as they beat on him. When they got outside, the men "squared off" to fight. The two men wrestled on the ground while Dias continued beating the defendant. Defendant testified that both men "got tired" and broke apart and he noticed blood spurting from his arm at this time. Defendant did not know he was bleeding during the fight. Defendant testified that he did not stab the victim that night and never had a knife that night. He testified that when the victim returned to the bar that night, he "looked furious, like he was raging and mad" and looked like he was "ready to kill somebody."
The defense rested and renewed its motion for acquittal which was denied. The court informed the parties that it would instruct the jury on voluntary manslaughter, in violation of R.C. 2903.03, as well as the offense charged, murder. At the conclusion of closing arguments, the judge instructed the jury. The court instructed the jury as follows on the inferior offense of voluntary manslaughter:
 THE COURT: Ladies and gentlemen, if you find that the state proved beyond a reasonable doubt all the essential elements of murder as charged in the indictment, you will continue your deliberations and decide from all the evidence if, in your judgment, the defendant acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim, a provocation that was reasonably sufficient to incite the defendant into using deadly force. Being under the influence of sudden passion or in a sudden fit of rage is one circumstance that may reduce the charge of murder to voluntary manslaughter. Murder requires that the death was caused purposefully while voluntary manslaughter requires that the death was caused knowingly.
(Tr. at 829). The only objection made regarding the charge was the defendant's request that the jury also be instructed on involuntary manslaughter and felonious assault, which was denied by the court.
Later, the court instructed on two separate verdict forms for murder and voluntary manslaughter:
 THE COURT: Again I just want to impress upon you that you will be making a guilty finding on only one of these verdicts.
(Tr. at 836).
Outside the presence of the jury, defense counsel addressed the court on this issue:
 THE COURT: All right. Aside from your prior objections, any other objections?
MR. RUKAVENA: No objection.
 THE COURT: Or modifications, or anything we left out?
 MR. CAMINO: Yes, Judge. This will be real brief. Since the jury has to return a verdict, they have to find guilty of murder before they go to voluntary manslaughter?
 THE COURT: Yes. They must make a determination. I tried to make that clear. I know it's a little confusing.
* * *
 MR. HURLEY: My point is they cannot get to Page 2 [the manslaughter verdict form] unless they find him guilty of murder?
 THE COURT: Right. In other words, if they don't find him guilty of murder they are finished.
MR. HURLEY: Right.
 THE COURT: I think that was explained. The voluntary manslaughter is only considered if there is a finding of guilt on the murder. That is in the instruction * * *.
(Tr. at 843)
No objection was made to the instruction after this side-bar conference. Thereafter, the jury retired for deliberations. On April 6, 1998, the court went on the record with a jury question. The question read as follows:
 In reference to verdict forms, we have been told that we must sign both forms, one being guilty, one being not guilty. The instructions state that after we find the defendant guilty of murder we then consider the reduced to voluntary manslaughter.
(Supp. Trans. of Proceedings at 3).
The court responded by informing the jury that if it found the defendant guilty of murder, then it was to go on and consider the extra mitigating factors of voluntary manslaughter, and if they find that those have been proven, they would find him not guilty of murder and guilty of voluntary manslaughter. The court then reiterated to the jury that defendant could be found not guilty of murder and guilty of voluntary manslaughter. (Supp. Trans. at 4). The record does not reveal any objections by defense counsel to the court's answer to the jury question or its supplemental instructions, thereby raising the issue of waiver.
After further deliberations, the jury found defendant not guilty of murder and guilty of voluntary manslaughter. Both jury forms contained the signatures of all twelve jury members.
At defendant's sentencing hearing on April 28, 1998, the court again denied defense counsel's renewed motion for acquittal and sentenced defendant to nine years incarceration. Defendant was advised of his appellate rights and a timely notice of appeal ensued.
We will address defendant's assignments of error in the order asserted and together where it is appropriate for discussion.
 I. APPELLANT, HAVING BEEN FOUND "NOT GUILTY" OF THE CHARGE OF MURDER, CANNOT THEREAFTER BE CONVICTED OF THE INFERIOR DEGREE OFFENSE OF VOLUNTARY MANSLAUGHTER.
 II. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SUBMITTED CONFUSING AND LEGALLY INCORRECT INSTRUCTIONS TO THE JURY ON THE MANNER OF THEIR DELIBERATIONS AND PRECLUDED "NOT GUILTY" VERDICTS ON BOTH CHARGES [MURDER AND VOLUNTARY MANSLAUGHTER.]
Defendant first asserts that he could not be found guilty of the inferior offense of voluntary manslaughter because the jury found him "not guilty" of the charge of murder. This assertion is without merit.
Murder is defined in R.C. 2903.02 as "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Voluntary manslaughter is an inferior degree of the offense of murder and is defined in R.C. 2903.03(A) as:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
Although voluntary manslaughter also involves the killing of another, the offense is inferior because it allows the defendant to mitigate the charge of murder to voluntary manslaughter when the crime was committed under heat of passion or a sudden fit of rage.State v. Benge (1996), 75 Ohio St.3d 136. In other words, it is an inferior offense of murder in which mitigating factors reduce the defendant's criminal culpability. State v. Tyler (1990), 50 Ohio St.3d 24,37; State v. Muscatello (1978), 55 Ohio St.2d 201.
In State v. Rhodes (1992), 63 Ohio St.3d 613, 617, the Supreme Court set forth a defendant's evidentiary burden in seeking to mitigate his offense from murder to voluntary manslaughter, as follows:
 R.C. 2903.03 defines voluntary manslaughter as a single offense that, under certain circumstances, permits a defendant to mitigate a charge of murder to manslaughter. The crime comprises elements that must be proven by the prosecution and mitigating circumstances that must be established by the defendant. * * * Under the statute, the jury must find a defendant guilty of voluntary manslaughter rather than murder if the prosecution has proven, beyond a reasonable doubt, that the defendant knowingly caused the victim's death, and the defendant has established by a preponderance of the evidence the existence of one or both of the mitigating circumstances.
Therefore, under the statute, the jury must find the defendant guilty of voluntary manslaughter rather than the more serious offense of murder if the prosecution has proven, beyond a reasonable doubt, that the defendant knowingly caused the victim's death, and the defendant has established by a preponderance of the evidence the existence of sudden passion or sudden fit of rage. The jury is not required, as defendant asserts, to find him guilty of murder before it can find him guilty of voluntary manslaughter. The jury may find defendant "not guilty" of murder while still finding him guilty of voluntary manslaughter. See State v. Sleppy
(March 5, 1999), Drake App. No. 96 CA 1412, unreported; State v.Sims (June 12, 1997), Cuyahoga App. No. 71236, unreported; State v.Cloud (June 15, 1996), Cuyahoga App. No. 67464, unreported; Statev. Thomas (Aug. 15, 1994), Cuyahoga App. No. 65300, unreported;State v. Dawson (Nov. 18. 1993), Cuyahoga App. No. 63122, unreported; State v. Abercrombie (Aug. 26, 1993), Cuyahoga App. No. 63695, unreported.
Even if, as the defendant contends, the verdict of not guilty on the murder charge and the guilty finding on the involuntary manslaughter charge may be arguably illogical or inconsistent, that is no grounds for an acquittal. See State v. Beehive Ltd.Partnership (1993), 89 Ohio App.3d 718, 728-29:
 Assume arguendo the verdicts of guilt against Beehive and acquitting the two individual defendants are inconsistent, this does not establish the evidence was insufficient to sustain Beehive's jury convictions. The fact that a jury returns inconsistent verdicts on several charges submitted to it does not demonstrate the evidence was insufficient as a matter of law to support the conviction or entitle the convicted defendant to be discharged or to obtain a new trial. See United States v. Powell (1984), 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461, and State v. Woodson, supra. The Supreme Court in Powell recognized this principle in the analogous context of inconsistent verdicts against a single individual on predicate and compound offenses, stating as follows:
 " * * * The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, * * * inconsistent verdicts — even verdicts that acquit on a predicate offense while convicting on a compound offense — should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusions on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing * * *.
 "Inconsistent verdicts therefore present a situation where `error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty and the fact the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course." (Emphasis, added.) United States v. Powell, supra, 469 U.S. at 65, 105 S.Ct. at 476-477, 83 L.Ed.2d at 468-469.
 The Supreme Court concluded that appellate courts are bound to review such convictions, notwithstanding any inconsistency in the jury verdict, under traditional sufficiency of the evidence standards, stating as follows:
 "* * * [A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with problems caused by inconsistent verdicts. Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." Id. at 67, 105 S.Ct. at 478, 83 L.Ed.2d at 470.
 Under the circumstances, Beehive has failed to demonstrate the trial court erred by refusing to enter a judgment of acquittal or granting a new trial on its three jury convictions in the case sub judice.
Defendant further asserts that the trial court charged the jury with confusing and legally incorrect instructions resulting in the jury's belief that it must find defendant guilty of either murder or voluntary manslaughter. The trial court clearly was correct in charging the jury on both murder and voluntary manslaughter.
It is well established that a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both acquittal on the charged crime of murder and a conviction for voluntary manslaughter. Tyler, supra, at 37; State v. Deem (1988), 40 Ohio St.3d 205,211; State v. Thomas (1988), 40 Ohio St.3d 213; State v.Hill (1996), 108 Ohio App.3d 279, 283.
In Hill, supra, at 283, this Court concluded that the trial court must charge the jury on both murder and voluntary manslaughter if it is possible for the trier of fact, when considering the evidence in the light most favorable to the defendant, to find the defendant not guilty of murder and guilty of involuntary manslaughter. In Hill, we stated:
 We believe that the evidence was clearly sufficient to require the court to submit instructions on both murder and the inferior crime, voluntary manslaughter. The defendant was indicted for murder, not voluntary manslaughter, but the evidence supported either offense. Under the circumstances, instructions on both offenses were proper.
 In State v. Rhodes (1992), 63 Ohio St.3d 613, 617, 618, 590 N.E.2d 261, 263-264, the Supreme Court held:
 "Voluntary manslaughter is, by our prior definition, an inferior degree of murder. State v. Tyler (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576, 592. * * * Thus, if a defendant on trial for murder or aggravated murder (or the prosecution in such trial) produces evidence of one or both of the mitigating circumstances set forth in R.C. 2903.03, that evidence will be sufficient to entitle a defendant to an instruction on voluntary manslaughter as an inferior degree of murder if under any reasonable view of the evidence, and when all of the evidence is construed in a light most favorable to the defendant, a reasonable jury could find that the defendant had established by a preponderance of the evidence the existence of one or both of the mitigating circumstances. State v. Wilkins
(1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 415 N.E.2d 303, 308."
 Therefore, if under any reasonable view of the evidence, it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the inferior offense, the instruction on the offense of the inferior degree must be given. The evidence must be considered in the light most favorable to the defendant. As stated in State v. Shane
(1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272, 274-275:
 "Voluntary manslaughter is an inferior degree of murder, for its elements are contained within the indicted offense, except for one or more additional mitigating elements * * *.'s State v. Tyler (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 294, 298. See Rhodes, supra, 63 Ohio St.3d at 617, 590 N.E.2d at 263. Even though voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought. Tyler, supra, 50 Ohio St.3d at 37, 553 N.E.2d at 592.
 "Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence present at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. Tyler, supra, at 37, 553 N.E.2d at 592; Deem, supra, 40 Ohio St.3d at 211, 533 N.E.2d at 299-300; State v. Thomas (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286, 289."
Hill, supra, at 282-283.
In the instant case, the record reflects that the trial court fully and fairly charged the jury on both murder and voluntary manslaughter. (Tr. at 826-835). specifically, the court charged the jury that if it found that the State failed to prove beyond a reasonable doubt any of the essential elements of the offense of murder, then its verdict must be not guilty. (Tr. at 828-829). The record further reflects that the jury was charged that if it found that the State proved beyond a reasonable doubt that the defendant knowingly caused the death of the victim and that if it was proven by a preponderance of the evidence that the defendant acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, it must find the defendant guilty of voluntary manslaughter. (Tr. at 834).
The trial court then reviewed the two verdict forms with the jury, one for murder and the other for voluntary manslaughter. The court clearly informed the jury that it was to determine whether there was evidence beyond a reasonable doubt to prove murder and that it was to then fill in the blank space on the appropriate form with either "guilty" or "not guilty." (Tr. at 836). The court further informed the jury that it would then determine whether sudden passion or fit of rage was proven by a preponderance of the evidence and if not, the jury was to make the appropriate finding on the voluntary manslaughter form. (Tr. at 836-837).
We find that the trial court correctly and accurately charged the jury on the law and clearly explained to the jury how it was to consider the mitigating circumstances of voluntary manslaughter.
Given the foregoing discussion, we find no merit to the defendant's contentions that the verdicts may not stand.
Defendant's Assignments of Error I and II are overruled.
 III. THE EVIDENCE IN THE CASE AT BAR WAS INSUFFICIENT, AS A MATTER OF LAW, TO CONVICT APPELLANT OF THE INFERIOR DEGREE OFFENSE OF VOLUNTARY MANSLAUGHTER, R.C. 2903.03.
 IV. APPELLANT's MANSLAUGHTER, R.C. 2903, IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.
The standard of review we must observe in passing on sufficiency of the evidence and manifest weight of the evidence issues were set forth by the Supreme Court of Ohio as follows inState v. Thompkins (1997), 78 Ohio St.3d 380, 386-87:
 The state asserts that sufficiency of the evidence and weight of the evidence are synonymous legal concepts. They are not. The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.
 With respect to sufficiency of the evidence, "`sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict, is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.")
The facts recited at length in the outset of this opinion established sufficient evidence to find the defendant guilty as to each and every necessary element of the offense of voluntary manslaughter.
The evidence established that the defendant was punched in the face without warning by the victim; a fight ensued and continued from the bar into the street; the defendant was seen on top of the victim punching him; the defendant was then seen getting off of the victim with a knife in his hand and dropping the knife down a sewer; the knife was recovered from the sewer and tested positive for the presence of blood and human protein; and defendant admitted he was the one who was in the fight with the victim.
Based on this evidence, defendant's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. The evidence presented at trial was sufficient for the jury to find beyond a reasonable doubt that defendant knowingly stabbed the victim and that it was proven by a preponderance of the evidence that the defendant acted while under the influence of sudden passion or in a sudden fit of rage brought on by the victim's unexpected punch and attack that was reasonably sufficient to incite the defendant into using deadly force. We cannot say that the jury clearly lost its way or that defendant's voluntary manslaughter conviction created a manifest miscarriage of justice.
Defendant's Assignments of Error III and IV are overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ROCCO. J., and BLACKMO, J., CONCUR.
 ______________________________ JAMES M. PORTER ADMINISTRATIVE JUDGE