[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 136.]

THE STATE OF OHIO, APPELLEE, *v*. BENGE, APPELLANT.

[Cite as *State v. Benge*, 1996-Ohio-227.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 95-112—Submitted December 5, 1995—Decided March 4, 1996.)

APPEAL from the Court of Appeals for Butler County, No. CA93-06-116.

———————————

{¶ 1} In the early morning hours of February 1, 1993, a car belonging to Judith Gabbard, defendant-appellant Michael W. Benge's live-in girlfriend, was found abandoned on the west side of the Miami River in Hamilton, Ohio. The vehicle was found near the river with the front passenger-side tire stuck in a gully. After the vehicle was towed to the impound lot, the tow-truck operator observed blood on the front bumper and passenger side of the car and notified the police.

{¶ 2} The police returned to the area where the car was found and discovered the body of Judith Gabbard in the Miami River. Her body had been weighed down with a thirty-five-pound piece of concrete which had been placed upon her head and chest. One of the pockets on the jacket Gabbard was wearing was empty and turned inside out. She still had in her possession her checkbook, cash and jewelry. The police retrieved a tire iron, or lug wrench, from the river approximately twelve to fifteen feet from where Gabbard's body was found. A jack and spare tire were found in Gabbard's trunk, but no lug wrench was discovered. Police removed lug nuts from the vehicle which were sent to a laboratory and compared with the lug wrench. Although no positive match was made, the lug nuts did bear markings which were similar to the lug wrench.

{¶ 3} The police gathered other physical evidence from the scene which was also tested by a forensic laboratory. Strands of hair and type A blood (which both Gabbard and appellant had) were found on the driver's side front tire. Smears of

blood were also discovered above the passenger-side headlight and on the fender. Police also found a pool of blood with a tire track through it and blood contained in the tire treads. According to one of the investigative detectives, this evidence indicated that the car had been driven through the blood and through the hair of the victim.

{¶ 4} An autopsy was performed, which revealed that the victim had suffered a number of blows to the head with a long blunt object which produced pattern abrasions and multiple skull fractures, one of which was circular in nature. According to the coroner, the victim died of brain injuries secondary to multiple skull fractures which were inflicted with a blunt object.

{¶ 5} The police apprehended Benge the next day, on February 2, 1993. When the detectives approached Benge on the street, they observed him drop Judith Gabbard's ATM card to the ground. They picked up the card, arrested Benge and took him into the station for questioning. After being read his Miranda warnings, Benge agreed to talk to the detectives. Benge told police that two black men in a Bronco had chased him and Gabbard to the river and that their car had gotten stuck. Benge claimed that one of the men injured Gabbard and took her ATM card while the other held him at gunpoint demanding the ATM code word. When Benge refused to tell him, the man returned the ATM card to him. Benge escaped by jumping into the river As he swam away, he heard Gabbard screaming as the men beat her. The detectives told Benge they did not believe his story. Benge told them he thought he should talk to a lawyer. The questioning ceased at that point.

{¶ 6} A short time later, Benge told police he was willing to talk. Benge signed a Miranda warning card indicating that he waived his Miranda rights. Benge then gave the police a tape-recorded statement in which he recounted a different version of what happened the night before. Benge told police that he had driven to the riverbank with Gabbard so that they could talk. He said that they had argued over the fact that he was addicted to crack cocaine. Gabbard also accused him of

2

being unfaithful to her. Benge then said he got out of the vehicle to urinate. At that point, he said Gabbard tried to run him down, but the car got stuck in the mud. Benge said that he became enraged, pulled Gabbard out of the car and began beating her with a metal pipe he found lying on the ground. Benge said he threw her body into the river, face down, disposed of the weapon and swam across the river. He did not recall whether he put any rocks or cement on her body. Benge then went to the home of his friend, John Fuller, to get dry clothes, which Fuller's fiance, Awantha Shields, provided.

{¶ 7} During this second interrogation, Benge was questioned about the ATM card, why he had dropped it when he saw the police and whether he had used it after killing Gabbard. Benge said he threw down the card because he was scared and he knew he would not need it anymore. He also told police that he had not used the card since he killed Gabbard, although he did allow a man by the name of Baron Carr to use the card once to get money to purchase crack cocaine. Benge claimed that the only reason he had the card in his possession was because he and Gabbard had used it on January 31, 1993 before they went out that evening. However, the police discovered through retrieving ATM records that no transaction had taken place on January 31, 1993 and that two transactions were made following Gabbard's death; on February 1, 1993 at 2:45 a.m. a $200 withdrawal was made and on February 2, 1993 at 12:01 a.m. another $200 was withdrawn.

{¶ 8} Benge was indicted on one count of aggravated murder in violation of R.C. 2903.01(B) with death penalty specifications under R.C. 2929.04(A)(3) (offense committed for the purpose of escaping detection for another offense) and R.C. 2929.04(A)(7) (offense committed during the commission of an aggravated robbery) as well as for aggravated robbery and gross abuse of a corpse. Benge pleaded no contest to gross abuse of a corpse. The case proceeded to trial on the other charges.

{¶ 9} At trial, the state called Awantha Shields, who testified that in the early morning hours of February 1, 1993, Benge arrived at the house she shared with John Fuller wearing wet clothes and asking for John. Benge also asked her if she had ever killed anyone. He then told her that he and his girlfriend had "got into it" earlier, that it blew over, and that they went to the river bank. He then told her that they had started fighting and that he hit her in the head no more than ten times with a crowbar, put rocks over her head and pushed her in the river. Benge told her that he had killed his girlfriend to get her "Jeanie" card. He also said that if the police questioned him he would lie and say that a couple of black guys jumped him and his girlfriend and beat his girlfriend up. He also told her that he had given her ATM card to a guy named Baron to get $200 to buy crack cocaine but that he never saw the money.

{¶ 10} Larry Carter testified that he and Baron Carr ran into Benge in the early morning of February 1, 1993. Benge, whose clothes were wet, asked Carter to excuse how he smelled but that he had just swum in the river. Carter thought Benge was kidding. Benge told him he had given John $20 to buy crack cocaine for him and said that he could get more money. Carter drove Benge and Carr to a Society Bank where Benge withdrew $200 from an ATM; Carter then bought crack cocaine for Benge. Carter later drove Benge to Fuller's house. Later that next night, Carter and Baron Carr withdrew another $200 from Gabbard's account using her ATM card so that they could buy drugs for Benge. However, to avoid giving the drugs or money to Benge, the two men conjured up a story and told Benge that his girlfriend had closed the account. Benge insisted that she had not.

{¶ 11} Benge took the stand on his own behalf and reiterated what he had told police during his second interrogation, including that Gabbard had tried to run him down and that he was in a rage when he killed her. Benge also claimed that he had permission to use Gabbard's ATM card and did not rob her. On cross-

4

examination, he admitted losing his job in January 1993 due to his crack cocaine habit and that he had no income at the time he killed Gabbard.

{¶ 12} Benge was convicted of all counts and specifications. Thereafter, the jury recommended that he be sentenced to death, and that recommendation was accepted by the trial court. The court of appeals affirmed Benge's convictions and death sentence.

{¶ 13} The cause is now before this court upon an appeal as of right.

————————————

*John F. Holcomb*, Butler County Prosecuting Attorney, *Daniel G. Eichel* and *Robert N. Piper III*, Assistant Prosecuting Attorneys, for appellee.

*David H. Bodiker*, Ohio Public Defender, *J. Joseph Bodine, Jr*. and *Stephen A. Ferrell*, Assistant Public Defenders, for appellant.

————————————

**FRANCIS E. SWEENEY, SR., J.**

{¶ 14} Benge presents twenty propositions of law for our review. Although we decline to address each one in writing, we have fully considered Benge's propositions of law, independently weighed the statutory aggravating circumstances against the mitigating factors, and reviewed the proportionality of the sentence to other similar cases. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Simko* (1994), 71 Ohio St.3d 483, 487, 644 N.E.2d 345, 350. For the reasons that follow, we affirm the convictions and the death penalty sentence.

I

Voluntary Manslaughter Instructions

{¶ 15} Appellant contends in his first proposition of law that the trial court's instruction on voluntary manslaughter was improperly worded and deprived him of a fair trial.

**{¶ 16}** The trial court first instructed the jury on the elements of aggravated murder. It further charged the jury as follows: "If you find that the State proved beyond a reasonable doubt all of the essential elements of aggravated murder, your verdict must be guilty of that offense and in that event you will not consider any lesser charge." The court told the jury to consider voluntary manslaughter if they find that the state failed to prove aggravated murder or aggravated robbery. The court then went on to define voluntary manslaughter and stated: "If you find that the State proved beyond a reasonable doubt that the Defendant purposely caused the death of Judith Gabbard but you also find the Defendant proved by a preponderance of the evidence that he acted while under the influence of sudden passion or in a sudden fit of rage either which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to insight [*sic*] the Defendant into using deadly force, then you must find the Defendant guilty of voluntary man slaughter [*sic*]."

**{¶ 17}** The court also instructed the jury that "[i]f the evidence warrants it, you may find the Defendant guilty of an offense lesser than that charged in the indictment.

**{¶ 18}** "However, notwithstanding this right it is your duty to accept the law as given to you by the Court, and if the facts and the law warrant a conviction of the offense charged in the indictment, namely aggravated murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense."

**{¶ 19}** The court also instructed the jury on how to complete the verdict forms and charged: "If your verdict is guilty [on the charge of aggravated murder], proceed to Specification One and Two and do not consider lesser included charges.

**{¶ 20}** "If your verdict is not guilty or if you are unable to reach a unanimous verdict, proceed to the lesser included charge of murder or voluntary man slaughter [*sic*]."

6

**{¶ 21}** Appellant argues that the court's instructions regarding voluntary manslaughter were erroneous because the jury was precluded from considering voluntary manslaughter once he was found guilty of aggravated murder. According to appellant, the jury should have been instructed that once it found the elements of aggravated murder present, it should assess whether the voluntary manslaughter evidence mitigated his culpability for the crime.

**{¶ 22}** Voluntary manslaughter is defined in R.C. 2903.03(A) and permits a defendant to mitigate a charge of aggravated murder or murder to manslaughter if the defendant establishes the mitigating circumstances of sudden passion or a sudden fit of rage in response to serious provocation by the victim sufficient to incite the defendant to use deadly force. *State v. Rhodes* (1992), 63 Ohio St.3d 613, 590 N.E.2d 261, syllabus; see, also, *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294. Voluntary manslaughter is considered an inferior degree offense to aggravated murder, which means that "its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *Id.* at paragraph two of the syllabus. We agree with appellant that the jury should have been instructed to consider the mitigating evidence to determine whether appellant proved voluntary manslaughter.

**{¶ 23}** Nevertheless, defense counsel below failed to object to the court's charge. Therefore, even if the jury instruction is deemed improper, such an error will not mandate reversal unless it constitutes plain error. In other words, we must determine whether "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. The only evidence of provocation was appellant's testimony that the victim tried to run him over and that he became enraged. However, the physical evidence, including the presence of blood and hair on the tire and both sides of the tire track, indicates that appellant may have driven the car through a pool of blood after he beat the victim. The testimony of several

state witnesses further support the state's version of what occurred rather than appellant's. Thus, there was sufficient evidence to support appellant's convictions. Based on the evidence presented, we find no plain error with the court's instructions. Accordingly, appellant's first proposition of law is overruled.

## II

## Prosecutorial Misconduct

{¶ 24} In his second and third propositions of law, appellant alleges prosecutorial conduct. Benge first points to the fact that during the guilt phase the state introduced a photo of him wearing a cap with the slogan, "No More Mr. Nice Guy" and in the penalty phase closing argument commented on that slogan. We find that the state's reference to this slogan does not warrant reversal. The photo of appellant wearing this cap was identified at trial as depicting how appellant was dressed the morning the victim was killed.

{¶ 25} Appellant alleges these further instances of misconduct during the penalty phase closing argument: (1) using nonstatutory aggravating circumstances by emphasizing the gruesome nature of the killing; (2) "trivializing" mitigation evidence; (3) arguing the absence of a mitigating factor; and (4) denigrating defense counsel by stating that defense counsel merely "has a job to do." In this case, with the exception of one example of alleged misconduct, defense counsel failed to object at trial. A close review of these comments reveals no plain error.

{¶ 26} We are mindful that a prosecutor is entitled to a certain degree of latitude in closing argument. *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O. 3d 489, 493, 433 N.E.2d 561, 566; *State v. Brown* (1988), 38 Ohio St.3d 305, 316, 528 N.E.2d 523, 537. Thus, it falls within the sound discretion of the trial court to determine the propriety of these arguments. *State v. Maurer* (1984), 15 Ohio St.3d 239, 269, 15 OBR 379, 404, 473 N.E.2d 768, 795. A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found appellant guilty. *State v.*

*Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082, 1102. Despite any alleged impropriety by the prosecutor, we believe that the jury would have nonetheless convicted him absent these comments; thus, we reject appellant's arguments.

{¶ 27} In his fourth proposition of law, appellant alleges several additional instances of prosecutorial misconduct during the guilt phase of the trial. First, Benge claims that in closing argument, the prosecutor speculated on the evidence by arguing that at the time of the killing Benge panicked, that he never intended to leave the victim's body at the scene and had intended to take the victim's jewelry and bank book and dispose of it. Although these remarks are highly speculative, the prosecutor prefaced them by using the words "I think," which indicates this was his opinion. Even if improper, defense counsel failed to object to these comments, which we find do not rise to the level of plain error.

{¶ 28} Appellant also claims that the prosecutor denigrated defense counsel. Appellant refers to an isolated incident where the prosecutor objected to the cross-examination of one of the state's witnesses and defense counsel responded by stating, "It's Cross-Examination." The prosecutor then said, "Well, Cross-Examination doesn't mean that you can get away with murder." Although this comment was certainly uncalled for and cannot be condoned, we do not believe that it deprived appellant of a fair trial. Cf. *State v. Keenan* (1993), 66 Ohio St.3d 402, 406-407, 613 N.E.2d 203, 207. Nor do we believe that the other instances of misconduct alleged by appellant warrant reversal. Accordingly, we reject these propositions of law.

### III

### Sufficiency of Evidence

{¶ 29} In Proposition of Law VI, appellant challenges the sufficiency of the evidence on the ground that the state failed to prove the underlying felony of aggravated robbery, as defined in R.C. 2911.01. According to appellant, the state failed to prove either that he murdered Judy Gabbard for the purpose of stealing her ATM bank card or that he actually stole it. Thus, he seeks reversal of his aggravated murder and aggravated robbery convictions.

{¶ 30} In reviewing the sufficiency of the evidence, "[a] reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. The facts presented here were sufficient to enable a jury to find appellant guilty beyond a reasonable doubt of the offenses he was charged with committing. Contrary to appellant's assertion, the state did not simply conjure up a story that appellant stole Gabbard's ATM card. The state presented the testimony of Awantha Shields, who testified that appellant arrived at her home shortly after Gabbard was killed and admitted to her that he had killed Gabbard for her bank card. There was also testimony that when the police approached appellant, he dropped the ATM card. Furthermore, one of Gabbard's jacket pockets was found inside out, which is evidence that something was taken from her. *State v. Tyler* (1990), 50 Ohio St.3d 24, 37, 553 N.E.2d 576, 592. There was also evidence that appellant had recently lost his job and needed money to support his drug habit. The fact that appellant presented his own version of events in order to support his claim that he had permission to use the ATM card simply brings the credibility of witnesses into play. However, this court will not "substitute [its] evaluation of witness credibility for the jury's." *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825.

**{¶ 31}** Based on the foregoing testimony, we believe that the prosecution presented sufficient evidence to convict appellant of aggravated murder and aggravated robbery. Thus, appellant's sixth proposition of law lacks merit.

IV

Spectator Outbursts

**{¶ 32}** In Proposition of Law VIII, appellant also contends that two outbursts made by relatives of the victim deprived him of a fair trial. In the first instance, one of the victim's relatives left the courtroom crying when a detective testified about the manner in which appellant carried out the killing. Defense counsel, who said the relative stormed out of the courtroom crying rather loudly, moved for a mistrial. However, the trial court overruled this motion and stated that this was a mischaracterization of what happened. Instead, the court viewed the episode as a minor disturbance. According to the court, the relative was simply upset and was not loud or disruptive. The court offered to admonish the jury, but defense counsel declined the offer.

**{¶ 33}** The second disturbance happened that same day during a lunch recess. As appellant was leaving the courthouse, another relative of the victim tried to attack him on the courthouse steps. Deputies prevented the attack and arrested the relative. Defense counsel again moved for a mistrial, which the court denied. Prior to the overruling of this motion, the trial judge questioned the jurors, outside the presence of the attorneys and appellant, to determine whether anyone witnessed the altercation and whether there was any grounds for finding bias. One alternate juror, who neither deliberated nor voted, heard yelling and screaming but did not see the attack. This juror said it would not interfere with his impartiality.

**{¶ 34}** The next day, a different juror expressed concern over whether precautions would be taken to ensure the jury's safety while leaving the courthouse. Once again, the court overruled defense counsel's motion for a mistrial. The court offered to further question the jurors but defense counsel again declined this offer.

**{¶ 35}** In *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267, we reiterated that the question whether an emotional outburst in a murder trial improperly influences the jury is a matter to be resolved by the trial court. Citing *State v. Bradley* (1965), 3 Ohio St.2d 38, 32 O.O.2d 21, 209 N.E.2d 215, syllabus, we stressed that "[a]bsent clear evidence in the record that the outburst improperly affected the jury, only the trial judge can authoritatively determine whether the jury was disturbed, alarmed, shocked or moved by the demonstration or whether the incident was of such a nature that it necessarily influenced the ultimate verdict of conviction. The answers to those questions invariably depends upon facts and circumstances which a reviewing court cannot ordinarily glean from the record.

**{¶ 36}** "Thus, the trial court determines, as a question of fact, whether the demonstration deprived the defendant of a fair trial by improperly influencing the jury. In the absence of clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed." (Citation omitted.) *State v. Morales,* 32 Ohio St.3d at 255, 513 N.E.2d at 271.

**{¶ 37}** Here, the trial court questioned the jurors to determine what they heard and whether they were biased and found that the outbursts were not prejudicial. Since there is no evidence to the contrary, we will not disturb the trial court's determination.

**{¶ 38}** Appellant also contends that he had a right to be present at all proceedings and that he was deprived of that right by being excluded from the trial court's discussions with the jurors. The Fifth Amendment to the federal Constitution, enforceable against the states through the Fourteenth Amendment, affords a criminal defendant the right to be present at all stages of his or her trial, including voir dire proceedings used to determine a juror's fairness and impartiality. *State v. Williams* (1983), 6 Ohio St.3d 281, 286, 6 OBR 345, 349, 452 N.E.2d 1323, 1330. Nevertheless, the error in excluding appellant from discussions between the trial judge and jurors was harmless error since appellant has not shown

how his presence would have benefitted him or how he was prejudiced. *State v. Roe* (1989), 41 Ohio St.3d 18, 27-28, 535 N.E.2d 1351, 1362. Appellant's eighth proposition of law is without merit.

V

Grand Jury Disclosure

{¶ 39} In Proposition of Law X, appellant argues that the trial court should have granted his motion to permit him access to transcripts of the grand jury proceedings. He maintains that since he was bound over on charges of murder and theft but indicted on elevated charges of aggravated murder with death specifications, aggravated robbery and gross abuse of a corpse, "something happened" in the grand jury proceedings.

{¶ 40} In *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus, we stated that an accused is not entitled to see grand jury transcripts unless the ends of justice require it and he shows that "a particularized need for disclosure exists which outweighs the need for secrecy." See, also, *State v. Webb* (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023, 1034. Such a need exists "'when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial.'" *State v. Davis* (1988), 38 Ohio St.3d 361, 364-365, 528 N.E.2d 925, 929, quoting *State v. Sellards* (1985), 17 Ohio St.3d 169, 173, 17 OBR 410, 413, 478 N.E.2d 781, 785. Determining whether there exists a particularized need is a matter within the trial court's discretion. *State v. Greer,* 66 Ohio St.2d at 148, 20 O.O.3d at 163, 420 N.E.2d at 988.

{¶ 41} In this case, the trial court found no particularized need. Appellant has not sustained his burden of showing that nondisclosure of the grand jury testimony deprived him of a fair trial. The fact that the grand jury indicted him on elevated charges is not in and of itself a sufficient showing of particularized need.

Since we find no abuse of discretion with the trial court's ruling, we overrule Proposition of Law X.

VI

Errors in Sentencing Opinion

{¶ 42} In his fifteenth proposition of law, appellant argues that errors within the sentencing opinion of the trial court warrant vacation of his capital sentence.

{¶ 43} Appellant contends that the trial court improperly considered nonstatutory aggravating circumstances by discussing the cold-bloodedness of the murder and by stating that the mitigating factors were "somewhat insignificant when *compared to the nature and circumstance* of this particular case." (Emphasis added.) However, earlier in its opinion, the trial court recognized the presence of only one statutory aggravating circumstance; the court stated that it had merged the specifications as duplicative, instructed the jury of the merger, and then only considered the statutory aggravating circumstance that the aggravated murder occurred during the commission of an aggravated robbery. Therefore, although the language cited by appellant suggests that the trial court may have weighed the nature and circumstances of the offense against the mitigating factors, we have previously held that "[w]hen a trial court correctly identifies a statutory aggravating circumstance, 'this court will infer that the trial court "understood the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense."'" *State v. Green* (1993), 66 Ohio St.3d 141, 149, 609 N.E.2d 1253, 1260, citing *State v. Wiles* (1991), 59 Ohio St.3d 71, 90, 571 N.E.2d 97, 120, and quoting *State v. Sowell* (1988), 39 Ohio St.3d 322, 328, 530 N.E.2d 1294, 1302. Additionally, assuming any defect in the trial court's assessment, this court's independent review will correct any such error. *State v. Landrum* (1990), 53 Ohio St.3d 107, 124, 559 N.E.2d 710, 729.

{¶ 44} Appellant further alleges that the trial court failed to give adequate weight to other mitigating factors under R.C. 2929.04(B)(7) and failed to consider

the testimony of his sister and daughter. However, the weight to be given mitigating evidence is left to the trial court's discretion. *State v. Mills* (1992), 62 Ohio St.3d 357, 376, 582 N.E.2d 972, 988. The court did not refuse to consider relevant mitigating evidence. We find no abuse of discretion. Accordingly, we reject appellant's fifteenth proposition of law.

## VII

### Independent Assessment of Sentence

{¶ 45} Pursuant to R.C. 2929.05(A), we now independently review the death penalty sentence for appropriateness and proportionality. Appellant was convicted of aggravated murder with two death penalty specifications and of aggravated robbery. The trial court properly merged the specifications and found that the aggravated murder occurred during the commission of an aggravated robbery. With respect to this aggravating circumstance, the evidence established beyond a reasonable doubt that the murder occurred while appellant committed the offense of aggravated robbery.

{¶ 46} Against the sole aggravating circumstance, we now weigh the mitigating factors contained in R.C. 2929.04(B). Of the seven factors listed, appellant's lack of a significant criminal history is entitled to some weight. R.C. 2929.04(B)(5); *State v. Stumpf* (1987), 32 Ohio St.3d 95, 106, 512 N.E.2d 598, 610. As to the catch-all provision of R.C. 2929.04(B)(7), which states that the court shall consider "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death," appellant urges this court to recognize his history, character and background, familial support, work record, drug abuse, remorse and residual doubt.

{¶ 47} Appellant's family background is entitled to some weight. There was testimony that appellant is an illegitimate child whose natural father died when he was three years old. He was later physically abused by a stepfather. At one point appellant broke his leg when his stepfather threw him down the stairs.

According to the testimony of a clinical psychologist, the loss of his biological father combined with the mistreatment by his stepfather made appellant suspicious of adults and contributed to his having a dependent personality and drug addiction.

{¶ 48} There was also testimony indicating that appellant was a loving, attentive father and that the murder was out of character for appellant. We find that appellant's family background is entitled to some weight.

{¶ 49} Appellant's work record is also entitled to some weight. Appellant's co-worker (and stepbrother-in-law) testified that appellant was a hard worker and prior to his drug problems rarely missed time at work. However, we give little weight to appellant's drug abuse, which constituted addiction (see *State v. Slagle* [1992], 65 Ohio St.3d 597, 614, 605 N.E.2d 916, 931), or to his expression of remorse made during his unsworn statement. See *State v. Post* (1987), 32 Ohio St.3d 380, 394, 513 N.E.2d 754, 768.

{¶ 50} Finally, we reject appellant's residual doubt argument. The evidence at trial supports appellant's convictions. Although appellant offered his own theory that he shared finances with the victim and was allowed to use her ATM card, there was sufficient other evidence to support the state's case that appellant committed an aggravated robbery during the murder. The evidence of guilt is convincing and residual doubt is not an important mitigating factor.

{¶ 51} Upon weighing the aggravating circumstance against the mitigating factors, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 52} The death penalty imposed in this case is both appropriate and proportionate when compared with similar capital cases. This court has approved the death penalty in several cases where the aggravating circumstance was aggravated robbery and where there was similar or stronger mitigation. See *State v. Green*, 66 Ohio St.3d at 152-154, 609 N.E.2d at 1262-1263); *State v. Carter*

(1995), 72 Ohio St.3d 545, 561-563, 651 N.E.2d 965, 979-980.  We therefore find the sentence of death to be neither excessive nor disproportionate.

{¶ 53} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, PFEIFER and COOK, JJ., concur.

————————————