OPINION
This timely appeal arises from a jury verdict finding Appellant, Kevin Young, guilty of aggravated murder. For the following reasons, this Court affirms the jury verdict and overrules Appellant's assignments of error.
Fourteen year old Heidi Bazar and then seventeen year old Appellant began dating in 1993. Their relationship continued intermittently with periods of strain arising from the fact that Appellant was dating other girls while seeing Heidi. On March 22, 1996, Heidi's high school held a dance. The couple was going through another breakup and had just started to see one another again after this breakup period. According to Appellant, Heidi asked him to accompany her to the dance but he did not go. Heidi's friends and mother indicated that Heidi had asked Appellant to the dance but then decided that she wanted to go with her friends. On the day of the dance, Appellant called one of Heidi's friends and asked her to keep an eye on Heidi and to let him know with whom she danced. (Tr. p. 338). Appellant called the friend again and warned the friend to stay out of the couple's business. (Tr. p. 338). Heidi's mother drove her to the dance where she was to meet her friends.
Near the end of the dance, Heidi and some friends decided to walk to a nearby convenience store. A male friend accompanied Heidi to the store and overheard her telephoning Appellant to come and pick her up there. (Tr. pp. 347-349). The male friend testified that he heard Heidi argue with Appellant and heard Heidi mention another male's name. (Tr. pp. 347-349). Following this telephone conversation, Heidi requested that her male friend leave before Appellant arrived. (Tr. p. 349). A female friend of Heidi's saw Heidi take a deep breath just before entering Appellant's car. (Tr. p. 352). Heidi did not come home from the dance that evening and was last seen with Appellant.
The day after the dance, Mrs. Bazar called Appellant and Heidi's friends to check on her daughter's whereabouts upon discovering that her daughter had not returned home the previous night. Appellant told Mrs. Bazar that he had been with Heidi the previous evening but that he had dropped her off near her home that night. (Tr. p. 462; 571-572) Appellant spoke to Mrs. Bazar more than once and each time told her that he did not know Heidi's whereabouts and that he had driven her home.
On March 24, 1996 Heidi's body was found at the bottom of a cliff at Old Route 7, a remote "lover's lane" location. The police arrested Appellant on that date at the home of his grandmother with whom he resided. Appellant initially denied knowing Heidi's whereabouts. (Tr. p. 579). However, Appellant later told the police that Heidi called him to pick her up at a convenience store by the dance and that they drove to Old Route 7. Appellant told police that he and Heidi got out of the car after having sexual relations and that Heidi immediately began arguing about other girls that Appellant had been dating. Appellant indicated that they were arguing near a cliff when Heidi slapped him and he grabbed her. Heidi was approximately five feet one inch tall and weighed approximately ninety seven pounds while Appellant was approximately five feet eleven inches tall and weighed about one hundred sixty pounds. Appellant stated that he pushed Heidi after she slapped him a second time and that she was too close to the cliff's edge at that moment and fell backwards down the side of the cliff.
Appellant told police that he climbed down the cliff to check Heidi's pulse but did not know how to do so. Appellant testified that he saw no blood on Heidi and that he tried to lift her up by placing his hands underneath her armpits but discovered that he could not carry her up the cliff, so he set her back down. Appellant related that he then panicked, climbed back up the cliff and left Heidi there because he had to go pick his grandmother up from work at 12:00 a.m. Appellant picked up his grandmother, a registered nurse, from work and drove home. Appellant recalled driving by Heidi's house that evening to check to see if her bedroom light was on to determine if she had made it home. The light was not on and Appellant went home.
After Appellant's arrest, extensive publicity in the form of media coverage surrounded the case. As an example of how heated the climate was, Heidi's step-grandfather struck Appellant on his way into a hearing. Following a grand jury indictment for aggravated murder, Appellant filed a motion for change of venue to the trial court which was denied by the court after voir dire. At the conclusion of the trial to a jury, the jury deliberated on charges of aggravated murder and murder. Appellant had unsuccessfully requested jury instructions as to involuntary and voluntary manslaughter during the trial.
The jury found Appellant guilty of aggravated murder. The court sentenced Appellant to life imprisonment with the possibility of parole after twenty years. Appellant filed a timely notice of appeal.
Appellant asserts six assignments of error. We will address these assignments out of order but as they arise according to the procedure of the case. Appellant's sixth assignment of error states:
 "THE TRIAL COURT ERRED IN NOT DISMISSING THE INDICTMENT OR, IN THE ALTERNATIVE, MAKING THE GRAND JURY RECORD AVAILABLE TO THE DEFENSE FOR PURPOSES OF A PRE-TRIAL MOTION TO DISMISS."
The original indictment charged Appellant with aggravated murder in violation of R.C. § 2903.01(A) and alleged that he purposely and with prior calculation and design caused Heidi's death. Upon defense motion for a bill of particulars, the State reiterated this charge and further provided that Appellant drove Heidi to a secluded area, "* * * where he deliberately and pre-meditatively struck and beat her numerous times causing her to bleed to death." (4/24/96 Bill of Particulars). On that same date, the State provided its response to Appellant's request for discovery which included a preliminary autopsy report and the death certificate.
On May 29, 1996, the State filed an amended bill of particulars reiterating the cause of death contained in the indictment and further alleging that the cause of death resulted from the force of blunt trauma or from strangulation.
Appellant thereafter filed a motion for production of the grand jury testimony arguing that the two additional causes of death were not presented to the grand jury and the grand jury testimony was necessary to effectively cross-examine and impeach the State's witnesses as to these two new theories of the cause of death. Appellant also filed a motion to dismiss the indictment, submitting that these new theories changed the essential nature of the charge against him and forced him to defend himself without prior grand jury consideration of the facts relating to an essential element of the offense for which he was charged.
The trial court overruled Appellant's motion and denied him access to the grand jury testimony after conducting an in camera inspection of the testimony and finding no discrepancy between the testimony and the bills of particulars. The court also found that Appellant failed to establish a particularized need for the testimony.
On appeal, Appellant argues that the trial court erred in denying him access to the grand jury testimony and resubmits that the State's last two theories as to the cause of death were not submitted to the grand jury. Although he had no access to the grand jury testimony, Appellant surmises that the State's only witness at the grand jury hearing, Belmont County Coroner Manuel Villaverde, testified as to only one cause of death: multiple beatings and strikings resulting in fatal blood loss. Appellant asserts that he must be convicted by the same evidence on which he was indicted, citing the Ohio Constitution, theFifth Amendment to the United States Constitution and State v. Vitale
(1994), 96 Ohio App.3d 695, 699.
Appellant's assignment is without merit. The Ohio Supreme Court has held that, "* * * an accused is not entitled to see grand jury transcripts unless the ends of justice require it and he shows that `a particularized need for disclosure exists which outweighs the need for secrecy.'" State v. Benge (1996), 75 Ohio St.3d 136,145, quoting State v. Greer (1981), 66 Ohio St.2d 139. A "particularized need" arises, "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." State v. Sellards (1985),17 Ohio St.3d 169, 173. Since the trial court possesses sound discretion to determine if a particularized need exists, this Court will not reverse the determination absent an abuse of discretion. Benge, supra citing Greer, supra. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the trial court that is arbitrary, unreasonable or unconscionable. State v. Adams (1980),62 Ohio St.2d 151. In applying an abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. In re Jane Doe 1 (1991), 57 Ohio St.3d 135,138.
We note that only a part of the grand jury transcript is in the record before this Court. Without the full transcript, this Court cannot make a finding that the trial court abused its discretion in denying access to the testimony and must presume regularity in the proceedings. See State v. Sneed (1992), 63 Ohio St.3d 3, 8. We also find that the trial court was in the best position to evaluate the grand jury testimony and to make such a determination upon in-camera inspection of the entire transcript.Id.
Further, we find no trial prejudice resulting from the denial of access to the grand jury transcript. Appellant was adequately informed of the charges against him through the working of the indictment and the bills of particulars. The addition of the causes of death were not essential elements of the offense and did not change the essence of the charges against Appellant. Nor do we find that the trial court erred in determining that Appellant's need for the transcript failed to assert a "particularized need."
In his fourth assignment of error, Appellant asserts:
 "THE TRIAL COURT'S JURY VOIR DIRE WAS INADEQUATE TO ENSURE THAT THE JURY IMPANELLED [sic] WAS FAIR AND IMPARTIAL."
Appellant had filed a pretrial motion for change of venue arguing that media publicity had infected the case, making it impossible to obtain a fair and impartial jury in Belmont County. Appellant attached numerous newspaper articles including pictures and media accounts of the case. Appellant asserted that the victim's step-grandfather, a local councilman, assaulted him at the first hearing and others threatened Appellant's life based upon the media accountings. Appellant also submitted that another sensitive issue in the case arose from the fact that he is African American while 98% of Belmont County is Caucasian. The court deferred ruling on the motion until it conducted a voir dire. The court subsequently overruled Appellant's motions after conducting an overall voir dire and an individualized voir dire in the courtroom and in chambers with counsel present. (Tr. pp. 30-31; 50; 56-166).
Appellant asserts that the court's voir dire did not touch on a heightened sensitivity to the pervasiveness of the pretrial publicity and that this resulted in a failure to adequately protect him against a taint on the fairness of the jury. Appellant insinuates that the court rejected his written submission of questions to ask the jury when the court informed the attorneys that it had already determined the questions which would be asked and told the parties to consider any requested question which was not asked to be denied. Appellant also contends that challenges for cause and peremptory challenges could not be made on the issue due to the limited voir dire and the absence of information on which counsel could make an informed decision to challenge.
This assignment of error is also without merit. With the constitutional right to a jury trial, a criminal defendant is guaranteed a fair trial by, "a panel of impartial, `indifferent' jurors." State v. Lundgren (1995), 73 Ohio St.3d 474, 479, quoting Irvin v. Dowd (1961), 366 U.S. 717, 722. An indifferent juror does not mean an ignorant juror. Id. As the United States Supreme Court held:
 "[i]n these days of swift, widespread and diverse methods of communication, * * * scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." Id.
Further, cases of presumed prejudice based upon pervasive pretrial publicity, "`are relatively rare. * * * [P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.'" Lundgren, supra, quoting NebraskaPress Assn. v. Stuart (1976), 427 U.S. 539, 554. The Ohio Supreme Court has held that, "`a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" Lundgren, supra citing State v. Landrum (1990),53 Ohio St.3d 107, 117, quoting State v. Bayless (1976), 48 Ohio St.2d 73,98, death penalty vacated (1978), 438 U.S. 911. The trial court has the sound discretion to determine the manner in which to conduct a voir dire. State v. Lorraine (1993), 66 Ohio St.3d 414,418.
When it appears that a criminal defendant cannot obtain a fair and impartial trial, a trial court should grant a change of venue. Lundgren, supra, citing Crim.R. 18 (B); R.C. 2901.12(K). A trial court has sound discretion to determine whether a change of venue is necessary and this Court will not disturb the trial court's determination, "`* * * unless it is clearly shown that the trial court has abused its discretion.'" Lundgren, supra citingState v. Maurer (1984), 15 Ohio St.3d 239, 250, quoting State v.Fairbanks (1972), 32 Ohio St.2d 34, 37.
While the record presents some indications that the trial court judge could have granted the change of venue in the instant case, we cannot find that the court acted arbitrarily, unreasonably or unconscionably in overruling the motion. As held in Lundgren,supra, we find that, "[d]espite the fact that pretrial publicity was extensive, the trial judge was in the best position to judge each juror's demeanor and fairness." 73 Ohio St.3d at 480. Nor can we find that the trial court abused its discretion in its performance of the voir dire. The voir dire is contained within approximately one hundred pages of the transcript. The transcript reveals that the court conducted an overall voir dire asking whether the venire had heard of the case through the media. (Tr. pp. 30-32). The court informed the prospective jurors that none of the information emanating from outside the courtroom could be used to come to their decision. (Tr. p. 32). The court also asked whether any juror felt that any media account had swayed their opinion so as to render them incapable of deciding the case impartially. (Tr. p. 31).
When defense counsel expressed his concern over the lack of depth into the pretrial publicity issue, the court conducted an individualized voir dire inquiring into the pretrial publicity issue and the issue of interracial relationships and bias. (Tr. pp. 48-50; 56-166). The court additionally conducted a voir dire in its chambers with most of the prospective jurors individually and with counsel present. (Tr. pp. 50-53; 56-166). The court without hesitation excused those jurors who revealed a bias from information gleaned through the media or from the interracial relationship between Appellant and the victim. The court specifically asked defense counsel if he was challenging for cause those individuals that revealed either an outright bias or a hesitation in the ability to be impartial. The court also took steps to ensure that the jurors were certain that they could decide the case only on the evidence presented in court. For example, when the court asked Juror Number 6 whether a decision could be made only on the evidence presented in court and from the law as instructed by the judge and the juror indicated, "I would like to think so," the court took further steps to confirm a definitive answer. (Tr. p. 72). The remaining jurors either indicated that they had not read much about the case or that the media accounts would not influence their decision.
Appellant asserts that the court limited the voir dire in such a manner that he could not obtain a fair and impartial jury. Appellant insinuates that the court rejected his submitted questionnaire of inquiries for the jury when the court told the attorneys that she had already formulated her own list of questions and that any of their questions not asked by the court were to be considered overruled. However, the transcript reveals that the trial court constructed its own questionnaire after considering the questionnaires of both Appellant and the State. (Tr. pp. 9-10). Further, the record does not show that Appellant was denied the ability to ask questions of the jurors and in fact shows that defense counsel did ask questions without court interference.
Appellant also alleges that the trial court was not sufficiently thorough in voir dire because the court failed to ask for a description of the media accounts each juror had observed. While this is true, the voir dire transcript does not demonstrate that the trial court acted unreasonably or arbitrarily in voir dire or in its questioning. While the court did not specifically ask what type of media exposure each juror had, some jurors volunteered the information and the court inquired of each juror whether the media exposure that they had had would influence them and effect their ability to objectively decide the case. The court also conducted an individualized voir dire both in the courtroom and in chambers. The court further allowed defense counsel to add questions that he felt were important to ensure the type of information he was looking for was elicited so that he could better evaluate the juror. (Tr. pp. 63, 67, 89, 91, 115). In fact, the court asked the attorneys a number of times if there were further questions that they would like to ask of the jurors. (Tr. p. 115, 133). The court excused a number of jurors after they indicated that they may be swayed by the media accounts they observed.
Further, Appellant did not use all of the peremptory challenges available to him. The Ohio Supreme Court has held that a defendant waives the right to challenge the makeup of a jury when all peremptory challenges have not been used. State v. Getsy
(1998), 84 Ohio St.3d 180, 189-190 [citations omitted]. Thus, we find this assignment of error is without merit.
In his fifth assignment of error, Appellant complains:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO ADMIT THE DEFENDANT'S EVIDENCE OF PRIOR ACTS BETWEEN THE DEFENDANT AND MS. BAZAR."
Appellant contends that the court erred in refusing to allow him to introduce into evidence an incident whereby Heidi allegedly requested that Appellant punch her in the stomach because she wanted to abort a pregnancy. Appellant argues that the exclusion of this incident prejudiced his case because the State was permitted to present evidence on a prior incident of violence between Appellant and Heidi. Appellant submits that if the jury had heard his excluded evidence, it may have inferred that Heidi also consented to the prior violent incident which was raised by the State. He claims this evidence may have made the jury more likely to believe that Appellant accidentally killed Heidi on the night in question.
The trial transcript lacks detail surrounding the oral motions in limine argued before the court. However, the transcript does indicate that the trial court overruled Appellant's oral motion in limine in part and allowed the State to present evidence of Appellant's prior aggressive behavior toward Heidi. (Tr. p. 378). The court did give a limited instruction to the jury on the use of this testimony which Appellant concedes was appropriate.
The court further granted the State's oral motion in limine prohibiting evidence or testimony as to Heidi's alleged abortion. (Tr. p. 378). The next reference to the evidence surrounding this alleged "consensual" assault appears in the transcript when Appellant's own counsel asks Appellant on the stand if he struck Heidi after she asked him to do so. (Tr. p. 610). Appellant answered "yes" just before the State objected and requested a sidebar. (Tr. p. 610). The court indicated that the objection was sustained without need for a sidebar. (Tr. p. 610). The court did not instruct the jury to disregard this testimony. (Tr. p. 610).
We find Appellant's assignment without merit. Admission or exclusion of evidence is within the sound discretion of the trial court to determine and this Court will not reverse that decision unless we find an abuse of discretion. State v. Finnerty (1989),45 Ohio St.3d 104, 107. A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner and a reviewing court should not substitute its judgment for that of the trial court. Id. at 108, citing generally State v. Jenkins
(1984), 15 Ohio St.3d 164, 222.
Appellant's "other acts" evidence regarding Heidi's alleged consent to be punched in the stomach to abort a pregnancy does not fall under any exception referenced in Evid.R. 404 (B). Further, the other act is not "inextricably intertwined" with the crime at issue in this case and identity is not an issue here. See State v. Curry (1975), 43 Ohio St.2d 66, 73; State v. Broom
(1988), 40 Ohio St.3d 277. Additionally, no assertions were made that Heidi's death resulted from Heidi's consent to an assault. In fact, Appellant denied striking Heidi and testified that Heidi fell off of the cliff after he instinctively pushed her when she slapped him.
When considering whether the probative value of evidence outweighs the danger of unfair prejudice under Evid.R. 403 (A), the trial court is vested with sound discretion to make such a determination and an appellate court should not interfere with that determination absent a clear abuse of discretion. See Statev. Allen (1995), 73 Ohio St.3d 626, 633 reconsideration denied,74 Ohio St.3d 1422, certiorari denied, 116 S.Ct. 1276, citingState v. Morales (1987), 32 Ohio St.3d 252, 257-58. An appellate court finds an abuse of discretion only when it determines that the trial court's attitude was unreasonable, arbitrary or unconscionable, and not merely an error of law or judgment. Statev. Adams (1980), 62 Ohio St.2d 151, 157. We cannot find that the court erred in excluding this evidence as wholly irrelevant and do not see a connection between an alleged "consent" to assault and the likelihood that a jury would believe that Appellant accidentally killed Heidi.
Even if the court erroneously excluded the testimony sought to be admitted, the testimony was to an extent admitted when Appellant answered that he had struck Heidi on a prior occasion at her request immediately before the State objected. (Tr. p. 610). As the court did not tell the jury to disregard the testimony it was thus considered by the jury. We find that this assignment is without merit.
Appellant's first assignment of error states:
 "THE TRIAL COURT ERRED WHEN IT DENIED MR. YOUNG'S REQUEST THAT THE JURY BE INSTRUCTED ON THE LESSER INCLUDED OFFENSES OF INVOLUNTARY AND VOLUNTARY MANSLAUGHTER."
Appellant argues that ample evidence existed in the record to support an instruction on either one or both of these offenses and that the court erred in only instructing the jury on aggravated murder and murder.
The Ohio Supreme Court in State v. Thomas (1988), 40 Ohio St.3d 213
held that a trial court must charge on a lesser included or inferior degree offense only where the evidence presented would reasonably support both an acquittal on the crimes charged and a conviction upon the lesser offense. See also State v. Carter
(1996), 115 Ohio App.3d 770, 774.
We shall address the involuntary manslaughter argument first. R.C. § 2903.04(A) and (B) define involuntary manslaughter; causing the death of another as the proximate result of committing or attempting to commit a felony or a misdemeanor. R.C. § 2903.04 is a lesser included offense of aggravated murder.State v. Campbell (1994), 69 Ohio St.3d 38, 47, citing Thomas,40 Ohio St.3d 213. Aggravated murder requires that the defendant possess a specific intent to cause the death of another, while involuntary manslaughter requires only that the killing occur as a proximate result of a felony or misdemeanor. Campbell, supra, citing State v. Jenkins (1984), 15 Ohio St.3d 164, 218. Murder requires the defendant to purposely cause the death of another. R.C. § 2903.02(A).
A defendant is entitled to an instruction on involuntary manslaughter, "only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another." Campbell, supra, quoting Thomas, supra
at 216. The court must view the evidence in the light most favorable to the defendant. State v. Wilkins (1980), 64 Ohio St.2d 382,388.
In Campbell, the Ohio Supreme Court held that an instruction on involuntary manslaughter was not warranted when the wounds suffered by the victim showed a purposeful killing.69 Ohio St.3d at 48. The Court found that, "[t]hese wounds refute Campbell's claim that he stabbed Turner `reflexively * * * without purpose to kill * * *'" Id. The Court further stated that:
 "[e]ven when the evidence is viewed in the light most favorable to Campbell, the number and location of his victim's wounds would compel any reasonable trier of fact to find intent to kill. Therefore, an involuntary manslaughter instruction would have been improper." Id.
The instant case is similar in that Appellant argued that Heidi fell off the cliff after he instinctively pushed her when she slapped him. However, the most critical of Heidi's over thirty wounds, including a fractured jaw, a broken nose, a liver severed almost in half, a tooth knocked out of her braces and strangulation, were indicative of purposeful killing and not accident. The county coroner and pathologist performing the autopsy testified that the wounds which caused her death could not have resulted from a thirteen foot fall off of a cliff or from an accident and most likely were caused by multiple blunt force to her face and neck. (Tr. pp. 230-231; 247; 285; 290; 314). From the number and severity of the wounds suffered by Heidi, any reasonable trier of fact could find that there existed an intent to kill by Appellant. We cannot find that the evidence presented reasonably supported an acquittal on aggravated murder or murder and a conviction on involuntary manslaughter. Thus, the court did not erroneously overrule Appellant's request for an involuntary manslaughter instruction.
Nor do we find that the court committed error in overruling Appellant's request for an instruction on voluntary manslaughter. First, defense counsel himself admitted that voluntary manslaughter was not an appropriate instruction. In discussing the request for instructions, the State stated the elements of voluntary manslaughter and defense counsel indicated that "[v]oluntary manslaughter does not fit." (Tr. p. 638).
Even if we could assume that the request for this instruction was not waived, an instruction on voluntary manslaughter was not warranted. R.C. § 2903.03 defines voluntary manslaughter. That section provides that:
 "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."
Voluntary manslaughter is an inferior degree offense to aggravated murder. State v. Benge (1996), 75 Ohio St.3d 136, 140. This means that the elements of voluntary manslaughter are identical to aggravated murder except that mitigating factors are present in a voluntary manslaughter situation. Id. The test for determining whether an instruction on voluntary manslaughter is warranted is the same as that for determining whether an instruction on a lesser included offense is warranted. State v.Shane (1992), 63 Ohio St.3d 630, 632 citing State v. Tyler
(1990), 50 Ohio St.3d 24, 37. Thus, a court must instruct on voluntary manslaughter when, "* * * the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter."Shane, supra.
This Court has held that a defendant is entitled to an instruction on voluntary manslaughter when sufficient evidence exists, "* * * that the defendant acted under the influence of sudden passion or in a sudden fit of rage caused by the victim which was reasonably sufficient to incite the defendant into using deadly force." State v. Carter (1996), 115 Ohio App.3d 770,774, citing generally, Shane, supra at 634; State v. Collins
(1994), 97 Ohio App.3d 438, 445. The defendant must meet the burden of proving the existence of these mitigating circumstances to warrant such an instruction to the jury. State v. Rhodes
(1992), 63 Ohio St.3d 613, 620.
In the case at bar, insufficient evidence was presented at trial to warrant an instruction on voluntary manslaughter. Again, the evidence of Heidi's numerous critical injuries do not reasonably support an acquittal on aggravated murder or murder. Further, the evidence at trial did not establish sufficient proof of the element of voluntary manslaughter; that Appellant was under the influence of passion or in a fit of rage to be incited into using deadly force against Heidi. While Appellant could have been provoked by Heidi's alleged slaps to his face, he outweighed her by nearly seventy pounds and was a foot taller than her. Further, Appellant himself testified that he was laughing when Heidi accused him of dating other girls and indicated that in the past when Heidi had tried to slap him, he would laugh. (Tr. p. 559).
Appellant argues in his brief that the jury could infer his rage when he testified that he shoved Heidi more aggressively after Heidi allegedly slapped him the second time. (Tr. p. 560). This is not sufficient evidence mandating an instruction on voluntary manslaughter. While it may be some evidence of rage, the Ohio Supreme Court has held that a defendant is not entitled to an instruction every time "some evidence" is presented on a lesser-included or inferior-degree offense. Shane,63 Ohio St.3d at 632. Further, Appellant testified that pushing Heidi was instinctive and was not given great thought. (Tr. p. 611). The court did not err in refusing to instruct the jury on the offense of voluntary manslaughter.
We shall address Appellant's second and third assignments of error together. They state:
 "THERE WAS INSUFFICIENT EVIDENCE OF `PRIOR CALCULATION AND DESIGN' TO SUPPORT A FINDING OF GUILT FOR THE OFFENSE OF AGGRAVATED MURDER.
 "THE JURY'S VERDICT OF GUILTY ON THE CHARGE OF AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Appellant properly preserved this error for appellate review on his motion for a Crim.R. 29 acquittal. Appellant specifically argues on appeal that the State presented no evidence tending to show that he caused the death of Heidi with prior calculation and design. Appellant asserts that the jury could not have found prior calculation and design as it was Heidi who called Appellant to come and pick her up after the dance, she was seen leaving with Appellant with no signs of nervousness, it was she who chose the Old Route 7 location, no evidence was shown to establish that he gave any prior thought to using a weapon to kill Heidi and any prior domestic problems between the two could not be used by the jury to imply violence or intent because the jury was instructed to use this evidence for limited purposes only. Appellant restates his theory that Heidi fell off of the cliff and submits that the medical evidence did not disprove his account beyond a reasonable doubt.
The Ohio Supreme Court has determined that "sufficiency of the evidence" and "weight of the evidence" are not synonymous legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. This Court has held that when reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine the evidence admitted to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Demiduk
(June 24, 1998), Columbiana App. No. 96-CO-16, unreported, citingState v. Jenks (1990), 61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. To reverse a lower court conviction based on legally insufficient evidence, only a concurring majority of the court of appeals panel reviewing the judgment is necessary. Thompkins,78 Ohio St.3d at 389.
On the other hand, the weight of the evidence:
 "* * * concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. * * *.'"
Id. at 387, quoting Black's Law Dictionary, (6th Ed. 1990), 1594. We can reverse on the weight of the evidence only after the State has presented both sufficient evidence to support a conviction and has persuaded the factfinder to convict. Id. at 388, citingTibbs v. Florida (1982), 457 U.S. 31, 41-43. To reverse Appellant's conviction based upon the weight of the evidence, we must find that, "`* * * the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins,78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. For such a reversal, all three judges on the court of appeals panel reviewing the case must unanimously concur. Thompkins,78 Ohio St.3d at 389.
At the time of the offense, R.C. § 2903.01(A) provided that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." The Ohio Supreme Court has found that no bright-line test exists for determining the presence or absence of prior calculation and design and that each case must turn on its own facts and evidence presented. State v.Taylor (1997), 78 Ohio St.3d 15, 20. The Court has further held that, "[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but `momentary deliberation' is insufficient." State v. D'Ambrosio (1993), 67 Ohio St.3d 185,196, citing Legislative Service Commission Comment to R.C.2903.01 and State v. Pierce (1980), 64 Ohio St.2d 281, 286-287. On the other hand, a prolonged thought process is not required.State v. Bailey (1992), 90 Ohio App.3d 58, 73.
The Supreme Court has provided guidance in helping to determine the presence of prior calculation and design:
 "[w]hen the evidence reveals the presence of sufficient time and opportunity for the planning of an act of homicide and the surrounding circumstances show a scheme designed to implement the calculated decision to kill, a finding of prior calculation and design by a trier of fact is justified." State v. Robbins (1979), 58 Ohio St.2d 74.
The Court has further held that:
 "The trier of fact must look to the context in which the killing occurred to determine whether there was prior calculation and design. Some of the important factors to be examined and considered * * * include: whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him [;] whether the relationship had been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events. These factors must be considered and weighed together and viewed under the totality of all circumstances of the homicide. * * *." State v. Jenkins (1976), 48 Ohio App.2d 99, 102.
Additionally, courts have found that the Jenkins
totality-of-the-circumstances test renders a defendant's conduct both before and after the victim's death pertinent to prior calculation and design. See State v. Lomax (Sept. 7, 1994), Hamilton App. No. C-930399, unreported; State v. Allen (May 25, 1994), Hamilton App. Nos. C-930159, C-930160, unreported.
Construing the evidence presented in a light most favorable to the prosecution, we find that sufficient evidence existed as to prior calculation and design to warrant Appellant's conviction. Using the test in Jenkins, supra, a reasonable factfinder could have concluded from the State's evidence that Appellant and Heidi had a relationship that was stormy at times and that involved episodes of violence and strain. Appellant admitted that on previous occasions when Heidi would hit him, he would push her. (Tr. p. 599). Most of the witnesses and Appellant himself testified that the relationship ran "hot and cold" and some testified that the couple was in a "cold" period immediately preceding Heidi's death. (Tr. pp. 337; 343; 357; 468; 485; 501; 522-524). Heidi's friend testified that Heidi wanted to end her relationship with Appellant. (Tr. p. 339). Witnesses further testified that Heidi was arguing with Appellant on the telephone when she called him to pick her up at the convenience store. Heidi was also seen taking a deep breath before entering Appellant's vehicle, perhaps preparing herself for when she told Appellant that she no longer wanted to continue their relationship.
A reasonable factfinder could also infer that sufficient thought and deliberation accompanied the murder by the remote location where Heidi's body was discovered and the weapons used to inflict the fatal injuries. Although Appellant provided the only testimony of the events transpiring by the cliff that night, a jury could conclude from the evidence that it was Appellant who drove to the lover's lane location. Appellant drove Heidi to a remote location upon arrival at Old Route 7 one that was well away from lighting. According to Appellant, the couple engaged in consensual sexual intercourse but then immediately following this intimacy, Heidi began arguing about Appellant dating other women. Appellant did not testify that Heidi told him that night that she wished to end the relationship. However, the officer interviewing Appellant after his arrest testified that Appellant told him that the couple argued after Heidi told Appellant that she wanted to end their relationship because Appellant was seeing other girls. (Tr. p. 331). Heidi's friend confirmed that Heidi had wanted to end the relationship with Appellant while Appellant wanted to get back together with Heidi. (Tr. p. 339).
Further, Appellant testified that he never struck or beat Heidi in any manner or with any object, including his hands, except for the pushes. (Tr. p. 617). However, a large brick, an eighteen pound chunk of concrete and a board were found near the location of Heidi's body and contained Heidi's blood. (Tr. pp. 373; 397-399; 402-407; 440; 441). The board contained fibers from Heidi's blue jeans and the chunk of concrete had been thrown away from Heidi's body. (Tr. p. 441). Appellant's testimony that he only pushed Heidi and she fell over the cliff to her death is inconsistent with the testimony of the coroner, the pathologist conducting the autopsy and the forensic pathologist. These experts testified that Heidi's fatal injuries resulted from a deliberate and intentional infliction of blunt force impacts to her head and trunk and did not result from a thirteen foot fall or an accident. (Tr. pp. 230-231; 247; 285; 290; 314). Although the pathologist performing the autopsy conceded at one point that "anything is possible," he testified that it was his belief to a degree of medical certainty that Heidi was beaten to death. (Tr. p. 290).
The forensic scientist testified that while some of the blood stains on the concrete chunk could have come from a thirteen foot fall, the blood spatters on a tree stump located near Heidi's body could not have been created by Heidi's impact with the concrete after the fall. (Tr. p. 443). The forensic scientist testified that two impacts by a blunt force were made to an already exposed blood source on Heidi and that these impacts occurred more than thirty inches above the ground level where the tree stump was located. (Tr. p. 445-446). The major exposed blood sources were confined to Heidi's head, except for a wound to the back of her right hand. (Tr. p. 278).
From this evidence, the jury could have reasonably inferred that Heidi was beaten to an extent that caused her to bleed and then beaten again on already exposed blood sources. Appellant testified that the lighting near the location was very dim and that he could see very little. (Tr. p. 561). Appellant testified that he could not see any blood on Heidi when he climbed down the cliff. (Tr. p. 563). These dimly lit conditions would also make it too dark to easily find a brick, a chunk of concrete and a board to inflict the fatal injuries upon Heidi and thus the jury could infer thought and preparation from the search for these three weapons. The fact that three different weapons were used could also infer thought and deliberation.
The jury also could have concluded that more than an "instantaneous eruption" occurred between Appellant and Heidi from the testimony regarding the number of wounds sustained by Heidi and the severity of the beating necessary to sustain such fatal wounds. See State v. Palmer (1997), 80 Ohio St.3d 543;State v. Perry (Dec. 5, 1997), Trumbull App. No. 96-T-5597, unreported. The coroner and pathologist performing the autopsy testified that Heidi sustained approximately thirty-five wounds, many that were inconsistent with a fall, including a severed liver, a fractured jaw, a tooth missing from her braces, a fractured eye socket and manual strangulation. The jury had sufficient evidence before it to find prior calculation and design and to convict Appellant of aggravated murder.
Nor can we say that, based upon the above evidence, the jury lost its way and created such a miscarriage of justice the conviction must be reversed as being against the manifest weight of the evidence. The jury could have attributed less credibility to Appellant's testimony due to his admission that, throughout this incident, he had continually lied to Heidi's parents concerning her whereabouts and his role and had originally lied to the police but changed his story to them after an officer told him his original story would not "hold up." (Tr. p. 600). Appellant's testimony also conflicted with the medical and scientific evidence presented that Heidi's fatal wounds were inconsistent with a fall and consistent with a deliberate and intentional severe beating. "The weight to be given the evidence and the credibility of witnesses are primarily jury issues."State v. Ballew (1996), 76 Ohio St.3d 244, 249, citing State v.Waddy (1992), 63 Ohio St.3d 424, 430; State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Thus, we must give deference to the factfinders because they are in the best position to observe the witnesses and their demeanor, gestures and voice inflections and are entitled to believe or disbelieve any witness. State v. Scott (Mar. 9, 1998), Mahoning App. No. 95 C.A. 140, unreported, citing State v. Antill (1964), 176 Ohio St. 61.
The jury could also have found Appellant's conduct after the incident relevant to the finding of prior calculation and design and relevant to his credibility. See Lomax, supra, unreported;Allen, supra, unreported. Appellant left his "girlfriend" lying on the side of a cliff, "not sure if she was dead or alive" (Tr. p. 607) and did not seek help. Appellant testified that he drove to pick up his grandmother, a registered nurse, immediately following this incident, but Appellant did not tell her of Heidi and her injuries. (Tr. p. 603). Further, Heidi's dead body was found partially concealed by rocks, debris and tree limbs. (Tr. p. 614).
For all of the foregoing reasons, we find that the assignments of error advanced by Appellant are without merit. Accordingly, the jury verdict is hereby affirmed.
Cox, P.J., concurs.
Donofrio, J., concurs.
APPROVED:
 ______________________ CHERYL L. WAITE, JUDGE