JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Jamarr Hairston, appeals from the judgment of the Cuyahoga County Court of Common Pleas, rendered after a jury verdict, finding him guilty of aggravated murder, in violation of R.C. 2903.01, with a firearm specification. Finding no merit to appellant's appeal, we affirm.
 {¶ 2} On January 11, 2001, the Cuyahoga County Grand Jury indicted appellant on one count of aggravated murder, with two firearm specifications. Appellant entered a plea of not guilty to the indictment and subsequently waived a jury trial on count two of the indictment, having a weapon while under a disability in violation of R.C. 2923.13. A jury trial commenced on July 12, 2001.
 {¶ 3} Sharon Small, the victim's mother, testified that she received a telephone call from her daughter Nicole about one week before she was murdered. Nicole, who was crying and very upset, asked her mother to pick her up. As a result of that phone call, Small took Nicole home to stay with her for several days.
 {¶ 4} Small testified that she questioned Yvonne Moses, a close friend of Nicole's, regarding the man Nicole was seeing and why Nicole had called her in such an agitated state. Small testified that Yvonne told her Nicole was seeing a man named Jamaal and that she was very concerned for her daughter's safety after she learned what had happened to make Nicole so upset.
 {¶ 5} Yvonne Moses testified that in December of 2000, she lived in apartment 406 at the Wade Park Chateau, a building well-known for drug activity. Moses testified further that Nicole visited her apartment frequently and would often stay with her for several days at a time. Moses also testified that she and Nicole would often get high together and Nicole would exchange sex for drugs.
 {¶ 6} Moses testified that she met appellant, whom she knew as "Jamaal," approximately five years before Nicole's murder, when she began buying drugs from him. Moses testified further that she had seen appellant smoke cigarettes.
 {¶ 7} According to Moses, in December of 2000, appellant began "coming around" the Wade Park Chateau almost every day. In the first week of December, Moses introduced appellant to Nicole and they had a sexual encounter in Moses' apartment. After appellant left the apartment, Nicole came out of the bedroom and showed Moses the dope that appellant had given her. Upon searching appellant's jacket, which he had left in the apartment, Moses and Nicole found an "eight-ball" of crack cocaine, i.e., cocaine with a street value of $250. While they were smoking what Moses estimated to be about $50 worth of the cocaine, appellant telephoned and told Moses to tell Nicole to return his drugs. Appellant returned to Moses' apartment later that evening and demanded the return of his drugs. When Moses insisted that she and Nicole did not have them, appellant pulled out a gun, placed it on a table and stated, "I am not playing with you all." Moses testified that the gun was "like a .38 special" and that she had seen appellant carrying a gun in the past.
 {¶ 8} Moses then pretended to look for appellant's drugs. According to Moses, appellant was irritated because Nicole did not help look for the missing drugs. Moses discreetly moved the drugs to her couch and then pretended to find them there. Moses gave the drugs to appellant, who told her that "we was going to have to pay for what we had took, what was missing." Appellant then left the apartment, taking Nicole with him. When Nicole returned approximately ten minutes later, she was nervous and called her mother, crying, to come get her.
 {¶ 9} Moses testified that she saw appellant at the Wade Park Chateau several times after that incident. On either December 13 or 14, appellant came to Moses' apartment to use her telephone. As he was leaving the apartment, he turned to Nicole, who was visiting Moses, and asked when he was going to get his $50. According to Moses, appellant told Nicole, "you think I am playing with you, don't you?"
 {¶ 10} Moses testified that the last time she saw appellant at her apartment was during the hours of 9 p.m. and 3 a.m. on December 15 and 16, 2000, when appellant sold drugs to her and a friend.
 {¶ 11} According to Moses, Nicole was at her apartment the evening of December 18, 2000. Another friend, Harold Davis, came over at approximately 10:30 p.m. Moses testified that as she and Davis left her fourth-floor apartment at approximately 11:30 p.m. to go to the store, she saw appellant on the second floor of the apartment building. Nicole remained alone in Moses' apartment. When Moses, Davis and Arletta Legget, the friend who drove them to the store, returned to Moses' apartment later that evening, they found Nicole dead. Moses testified that upon seeing Nicole's body, she ran out of her apartment screaming "No, Jamaal, no."
 {¶ 12} Moses testified that although appellant never threatened to kill her, "what he said was enough." According to Moses, appellant told her that "he wasn't going to mess with us" in December because "it was a holy month" but "he was going to serve us on the 1st." Moses testified that she interpreted appellant's statement to mean that "he was going to come and do some type of bodily harm to me and Nicole. We was in some big trouble come January 1st."
 {¶ 13} Moses subsequently identified appellant as the man she knew as Jamaal through a police photo array.
 {¶ 14} Arletta Leggett testified that two weeks before Nicole was shot, appellant told her that he had had a dispute with someone who had taken his drugs. Leggett testified further that appellant was upset and told her "that he should kill those bitches or kill that bitch or some shit like that."
 {¶ 15} Diane Gore testified that she and her husband lived in apartment 206 at the Wade Park Chateau in December 2000. According to Gore, she saw appellant at the Wade Park Chateau approximately twice a week. Gore was aware that appellant carried a gun while he was at the Chateau because she had seen it on several occasions.
 {¶ 16} Gore testified that on the evening of December 18, 2000, she heard two gunshots as she was going down the stairs to leave the building. Gore continued down to the lobby of the building and then saw appellant coming out of another stairway into the lobby. Gore saw appellant put a gun in his pants as he walked down the hallway and then heard him tell another resident, "Don't forget what I said or the same thing is going to happen to you." Gore then saw appellant walk out the back door of the building and get into a gold Nissan Maxima driven by "Donny-man."
 {¶ 17} Deonte Burston testified that his nickname is "Donny-man." Burston testified that he often went to the Wade Park Chateau to sell drugs. Burston testified further that he had known appellant for five years and frequently saw him at the Wade Park Chateau.
 {¶ 18} According to Burston, on December 18, 2000, he arrived at the Wade Park Chateau at approximately 11:30 p.m. He parked his gold Nissan Maxima in the back of the building and entered the building through the back door. After only a few minutes, appellant appeared and asked him for a ride home.
 {¶ 19} Burston testified that appellant called him the next day and asked him to meet him at a restaurant. Later, at the restaurant, appellant told Burston that he had confronted Nicole the night before regarding the drugs she had taken from him and then shot her three times. Burston testified that he thought appellant was "playing," but appellant told him, "it's for real."
 {¶ 20} Dr. Erica Wilson, deputy coroner at the Cuyahoga County Coroner's Office, testified that she performed an autopsy on Nicole Small. Dr. Wilson testified that Nicole's death was ruled a homicide, the result of three gunshot wounds to her head. Dr. Wilson testified further that stipling and soot found around the wounds indicated that they were sustained at a range of three feet or less.
 {¶ 21} Curtiss Jones, a forensic scientist in the Trace Evidence Department of the Cuyahoga County Coroner's Office, testified that Nicole's right hand and left palm tested positive for gunshot residue. Jones testified further that Nicole's hands did not react to a trace metal detection test, which meant that she had not held a metal object in her hands prior to her death.
 {¶ 22} Thomas Lucey, a City of Cleveland police detective who works in the Department's Scientific Investigation Unit, testified that he analyzed the three bullets recovered by the Coroner's Office from Nicole's body. Based on his tests, he concluded that at least one of the bullets came from a .38 or .357 millimeter revolver.
 {¶ 23} Cleveland Police Detective Joseph Chojnowski testified that he arrived on the scene of the shooting at approximately 1:30 A.M. on December 19, 2000. Chojnowski collected evidence from the scene, including eight cigarette butts found in the ashtray in the living room of Moses' apartment.
 {¶ 24} Andrea Fischer testified that her primary responsibility as a forensic scientist in the Cuyahoga County Coroner's Office is DNA analysis. Fischer analyzed appellant's DNA and the DNA from the eight cigarette butts. According to Fischer, appellant's DNA was not found on seven of the cigarettes she tested but could not be excluded from one of the eight cigarettes recovered from the ashtray. Fischer testified that it was highly unlikely an individual unrelated to appellant would have his same DNA profile.
 {¶ 25} At the close of the State's case, the trial court denied appellant's Crim.R. 29 motion for acquittal. Appellant withdrew his notice of alibi and rested without presenting any witnesses.
 {¶ 26} The jury subsequently found appellant guilty of aggravated murder, with a firearm specification. The trial court sentenced appellant to thirty years to life in prison on the aggravated murder charge, and three years incarceration on the firearm specification, to be served consecutively. In light of the verdict, the State dismissed count two of the indictment.
 {¶ 27} Appellant timely appealed, raising four assignments of error for our review.
 I. {¶ 28} Appellant first contends that the prosecutor's misconduct during trial constitutes grounds for reversal of his conviction.A prosecuting attorney's conduct during trial does not constitute a ground for error unless the conduct deprives the defendant of a fair trial.State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Smith v.Phillips (1982), 455 U.S. 209, 219. The effect of the prosecutor's alleged misconduct must be considered in light of the entire trial. Statev. Maurer (1984), 15 Ohio St.3d 239, 266.
 {¶ 29} The test regarding prosecutorial misconduct in closing argument is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. State v.Smith (1984), 14 Ohio St.3d 13, 14. A prosecutor is afforded wide latitude in closing arguments. State v. Jacks (1989), 63 Ohio App.3d 200,210. It is within the trial court's discretion to determine if a prosecutor has gone beyond the bounds permitted. State v. Benge (1996),75 Ohio St.3d 136. A judgment will not be reversed if it is clear beyond a reasonable doubt that, absent the prosecutor's remarks, the jury would have found the defendant guilty. State v. Loza (1994), 71 Ohio St.3d 61,78.
 {¶ 30} Appellant asserts that the prosecutor committed misconduct by purposely failing to disclose the address of Diane Gore, a key State's witness, to the defense. On June 15, 2001, the State filed a supplemental discovery response in which it listed Diane Gore's name as a potential witness but indicated that her address was unknown. Appellant contends that the prosecutor knew Gore's address, however, but deliberately withheld it from defense counsel. The record belies appellant's argument.
 {¶ 31} Gore testified that she contacted one of the detectives investigating the case approximately one week after the murder. She testified further that when she subsequently met with the detective at a McDonald's restaurant and he asked her about her address and telephone number, she told him, "I didn't want them to know where I lived." Gore never testified that she informed anyone of her actual address. Indeed, Gore testified that when she was served with a subpoena shortly before trial, she wondered how the prosecutors got her address.
 {¶ 32} The record also reflects that on June 15, 2001, prior to filing the State's supplemental discovery response, the prosecutor saw defense counsel in another courtroom and informed him, "David, by the way, we have an additional witness, Diane Gore. We are going out to look for her, but I don't believe that we will have a real hope of finding her. We just found her now." On this record, we cannot find that the prosecutor willfully withheld Gore's address from defense counsel.
 {¶ 33} Appellant also contends that misconduct occurred in opening statement when the prosecutor, referring to the cigarette butts taken from Moses' apartment and the subsequent DNA testing performed on them, stated, "There is physical evidence that he [appellant] is present at the time of this shooting." Appellant argues that this statement was improper because the State did not produce any evidence that appellant smoked. Therefore, he argues, there was no factual foundation for the prosecutor to assert that the DNA linked appellant to the homicide. Appellant's argument is without merit.
 {¶ 34} The record reflects that when she was asked, "Does the defendant smoke cigarettes?", Yvonne Moses testified, "I have known him to smoke cigarettes but I have never seen him smoke cigarettes, just plain cigarettes." Thus, Moses testified that she had seen appellant smoke cigarettes, although the type of cigarettes that appellant smoked is not entirely clear from her statement. Accordingly, there was a factual foundation for the prosecutor's statement that the physical evidence would indicate that appellant was in Moses' apartment the night of the murder.
 {¶ 35} The prosecutor also commented in opening statement that various detectives investigating Nicole's murder left messages with appellant's relatives and made appointments through those relatives for appellant to meet with them, but appellant did not keep the appointments. The prosecutor then commented that appellant "kept his appointment at the Cleveland Muni Court Probation Department and that's where he was arrested." Appellant contends that these comments were improper and constituted prosecutorial misconduct.
 {¶ 36} We agree that the comments were improper. There was no evidence produced at trial to demonstrate that appellant had a prior criminal record. The prosecutor's statement that appellant was arrested at the Cleveland Municipal Court Probation Department, however, improperly conveyed that information to the jury. Moreover, there was no evidence produced at trial that there was a warrant for appellant's arrest pending at any time when the detectives were arranging appointments to meet with him. Accordingly, contrary to what the prosecutor's statement implied, appellant had no duty to meet with the detectives.
 {¶ 37} The prosecutor also improperly commented in closing argument that appellant could have performed his own testing on the cigarettes. The prosecutor stated, "Keep in mind they had the opportunity to test the stuff too, all that stuff is still available at the coroner's office to be tested."
 {¶ 38} This comment was clearly improper. As the trial judge informed the jury after sustaining defense counsel's objection to this comment, a defendant "is not required to in any way, shape or form present any evidence on his own behalf during the course of trial and Mr. Mahoney knows better."
 {¶ 39} In the context of the entire trial, however, we cannot conclude that these isolated statements denied appellant a fair trial. As set forth in our discussion regarding the weight of the evidence in this case, there was substantial, credible evidence from which the jury could have found appellant guilty of aggravated murder. In light of the evidence, it is clear that even absent the prosecutor's improper comments, the jury would still have found appellant guilty.
 {¶ 40} Appellant's first assignment of error is therefore overruled.
 II. {¶ 41} In his second assignment of error, appellant contends that he was denied his right to effective assistance of counsel.
 {¶ 42} As explained by the Supreme Court of Ohio in State v.Campbell (1994), 69 Ohio St.3d 38, 43:
 {¶ 43} "A defendant who claims ineffective assistance must show deficient performance by counsel and resulting prejudice. Strickland v.Washington (1984), 466 U.S. 668. The performance inquiry requires the court to ask whether, considering all the circumstances, `counsel's representation fell below an objective standard of reasonableness.' Id. at 688. The court `must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.' Id. at 689. The prejudice inquiry `is whether there is a reasonable probability that, absent the errors, the factfinder would have acquitted the defendant * * *.' Id. at 695. `A reasonable probability is a probability sufficient to undermine confidence in an outcome.' Id. at 694.
 {¶ 44} Appellant first contends that one of his counsel, Jake Hildebrand, was ineffective because he did not meet the qualifications for the assigned counsel list maintained by the Cuyahoga County Common Pleas Court, see Loc.R. 33, did not ask for an acquittal in his opening statement and did not cross-examine Arletta Leggett regarding her testimony that appellant had told her he should "kill the bitch." Appellant's argument is without merit.
 {¶ 45} First, upon questioning by the trial judge, appellant specifically noted that he had no objection to Mr. Hildebrand's participation in the trial. Accordingly, appellant waived this issue for purposes of appeal. Moreover, John Hildebrand, Sr. and David Grant were appellant's assigned counsel, not Jake Hildebrand. Therefore, there was no requirement that Jake Hildebrand meet the requirements for assigned counsel in an aggravated murder case.
 {¶ 46} Furthermore, in his opening statement, Mr. Hildebrand reviewed the evidence and then asked the jury to return a "true verdict." Although appellant may quibble about the exact words used, we read this to mean "not guilty." Finally, trial tactics and strategies do not constitute a denial of effective assistance of counsel. State v. Clayton
(1980), 62 Ohio St.2d 45, 49. Therefore, Mr. Hildebrand's strategic decision not to remind the jury during his cross-examination of Arletta Leggett about her earlier testimony that appellant told her he should "kill the bitches or kill the bitch" is not ineffective assistance of counsel.
 {¶ 47} Appellant also contends that his assigned counsel was ineffective because they did not 1) object to the prosecutor's improper statements during opening argument regarding appellant's failure to keep his appointments with the police and his subsequent arrest at the Cleveland Municipal Court Probation Department; 2) ask for a continuance of the trial to investigate Diane Gore; and 3) object to improper jury instructions.
 {¶ 48} As discussed earlier, the prosecutor's comments during opening statement were improper and, therefore, defense counsel should have objected to them. The trial judge instructed the jury that opening statements are not evidence to be used in considering the guilt or innocence of the accused, however, and also gave an instruction regarding appellant's right not to testify. Moreover, in light of the evidence of appellant's guilt adduced at trial, it is apparent that appellant was not prejudiced by these isolated, improper comments.
 {¶ 49} Appellant also contends that his assigned counsel was ineffective because they did not ask for a continuance of trial to further investigate Diane Gore. There is nothing in the record, however, to indicate that a continuance would have been beneficial to appellant. Moreover, a decision regarding whether or not to ask for a continuance of trial under these circumstances is a strategic decision that does not form the basis for an ineffective assistance of counsel claim.
 {¶ 50} The record also does not support appellant's argument that the trial court gave improper jury instructions. Contrary to appellant's argument, the trial judge properly informed the jury that if the State failed to prove "any one" of the elements of the crime of aggravated murder, then their verdict must be not guilty.Appellant also contends that the trial court erroneously advised the jury that they must unanimously acquit the defendant of aggravated murder before they could consider lesser offenses. Appellant contends that these instructions were erroneous under State v. Thomas (1988), 40 Ohio St.3d 213, 218-221, which held at paragraph three of the syllabus:
 {¶ 51} "If a jury is unable to agree unanimously that a defendant is guilty of a particular offense, it may proceed to consider a lesser included offense upon which evidence has been presented. The jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense."
 {¶ 52} Here, the trial judge informed the jury, "If all of you are unable to agree on a verdict of either guilty or not guilty of aggravated murder, then you will continue your deliberation to decide whether the State has proved beyond a reasonable doubt all of the essential elements of the lesser included offense of murder." Unlike the instruction error that occurred in Thomas, the jury was not instructed to unanimously acquit appellant of aggravated murder before moving to the lesser offense of murder. Thus, counsel's failure to object was not error.
 {¶ 53} Finally, appellant argues that his counsel was deficient because they did not object to the trial court's failure to give an instruction on voluntary manslaughter, even though they asked for the instruction and the State indicated that it did not object. Our review of the record, however, indicates that there was insufficient evidence to support an instruction on voluntary manslaughter. Accordingly, trial counsel's failure to object was not ineffective assistance of counsel.
 {¶ 54} Appellant's second assignment of error is therefore overruled.
 III. {¶ 55} In his third assignment of error, appellant contends that there was insufficient evidence to support his conviction.
 {¶ 56} A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the State has met its burden of production at trial. State v. Thompkins (1997),78 Ohio St.3d 380, 390. On review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Id. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 57} R.C. 2903.01(A), regarding aggravated murder, provides that "no person shall purposely, and with prior calculation and design, cause the death of another." Appellant contends that the State failed to produce sufficient evidence that the homicide was committed with prior calculation and design.
 {¶ 58} The phrase "prior calculation and design" is a single indivisible term, describing the mens rea element of proof necessary to find a violation of R.C. 2903.01(A). State v. Taylor (1997),78 Ohio St.3d 15, 18. It indicates "studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim. Neither the degree of care nor the length of time * * * are critical factors in themselves, but they must amount to more than momentary deliberation." Id. There is no bright-line test that emphatically distinguishes between the presence or absence of prior calculation and design. Rather, each case turns on the particular facts and evidence presented at trial. Id.
 {¶ 59} Here, viewing the evidence in a light most favorable to the prosecution, as we are required to do, we conclude that the evidence presented at appellant's trial was sufficient to support a finding of prior calculation and design.
 {¶ 60} The evidence indicated that appellant threatened Nicole with a gun several times before she was murdered. Shortly after appellant learned that Nicole had stolen drugs from him, he demanded that she return the drugs, showing her his gun and stating, "I am not playing with you all." He then took Nicole out of the apartment for approximately ten minutes and apparently threatened her again, because when she returned, she was upset and crying and called her mother to come pick her up.
 {¶ 61} The evidence also indicated that appellant made his intentions to kill Nicole well-known. Appellant told Arletta Legget about the dispute with Nicole over his drugs and told her that he "should kill the bitch." He also threatened Yvonne Moses that he was going to "serve" her and Nicole on January 1, a statement that Moses interpreted to mean that appellant was going to "do some type of bodily harm to me and Nicole."
 {¶ 62} The evidence also indicated that Yvonne and Harold saw appellant on the second floor of the Wade Park Chateau as they were leaving the building on the night of Nicole's murder. The evidence further demonstrated that appellant, who usually carried a gun, did, in fact, have a gun that night. Finally, the evidence indicated that Nicole was shot not once but three times.
 {¶ 63} The jury could have reasonably inferred from this evidence that appellant thought about shooting Nicole for some time prior to her death, took the gun with him to Wade Park Chateau with an intention to use it when an opportunity presented itself, and then seized the opportunity to kill Nicole when he knew Yvonne Moses and her friends had left the building. Therefore, the jury could have reasonably found the required element of "prior calculation and design."
 {¶ 64} Appellant's third assignment of error is therefore overruled.
 IV. {¶ 65} Finally, appellant contends that his conviction was against the manifest weight of the evidence.
 {¶ 66} A manifest weight of the evidence argument involves determining whether there exists a greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Weight is not a matter of mathematics, but depends on its effect in inducing belief. Id.
 {¶ 67} When reviewing a claim that the judgment in a criminal case is against the manifest weight of the evidence, this court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, supra, citing State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 68} Appellant asserts that his conviction was against the manifest weight of the evidence because no one who saw him shortly after the murder testified that they observed any blood on him. The record, however, indicates that neither the prosecutor nor defense counsel asked Burston or Gore — the two witnesses who testified that they saw appellant leaving the Wade Park Chateau after the murder — whether they saw any blood on him. Without the question, there obviously would be no testimony on this issue.
 {¶ 69} Appellant also contends that no one testified that they saw him smoke and, therefore, the testimony that his DNA could not be excluded from one of the cigarettes found in the ashtray at Moses' apartment is not reliable. Contrary to appellant's argument, however, Yvonne Moses specifically testified that in the five years she knew appellant, she had "known him to smoke cigarettes."
 {¶ 70} Appellant also contends that his conviction is against the weight of the evidence because there were no fingerprints in the apartment linking him to the crime scene. Despite the lack of fingerprints, however, there was evidence that appellant's DNA was present on a cigarette found at the crime scene. The weight to be given the evidence was for the jury to decide, State v. DeHass (1967),10 Ohio St.2d 230, 231, and the jury apparently resolved this conflict in favor of the State.
 {¶ 71} Finally, appellant contends that many of the witnesses who testified for the State were not credible because they were either drug dealers or drug users and lived in an apartment building infested with drug activity and prostitution. We find this argument unpersuasive.
 {¶ 72} Appellant frequented the Wade Park Chateau and participated in the illegal activity that regularly occurred there. Therefore, his association with these people — and his presence at the Wade Park Chateau the night of the murder — determined who the witnesses against him would be.
 {¶ 73} Moreover, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. DeHass, supra. Here, the jury apparently found the witnesses to be credible. We find nothing in the record to indicate otherwise.
 {¶ 74} In light of the evidence produced at trial, it cannot be said that the jury lost its way or created such a miscarriage of justice that appellant's conviction must be reversed. The record is replete with testimony that less than two weeks before she was murdered, appellant had an argument with Nicole regarding the drugs that she had taken from him. The record also indicated that appellant threatened Nicole and told at least one person that he "should kill the bitch." The evidence also indicated that appellant was at the Wade Park Chateau the night of Nicole's murder, carrying a gun, and that he left the scene with Deonte Burston shortly after the shots were heard. The next day, appellant told Burston that he had shot Nicole. One of the bullets retrieved from Nicole's brain was from a .38 caliber revolver, the same kind of gun appellant pulled out and displayed to Yvonne Moses and Nicole when he threatened them. Finally, appellant's DNA was found on a cigarette butt confiscated from Moses' apartment after the murder, even though the last time Moses had seen appellant in her apartment was three days earlier.
 {¶ 75} In light of this evidence, it is apparent that appellant's conviction for aggravated murder was not against the weight of the evidence. His fourth assignment of error is therefore overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, J. and FRANK D. CELEBREZZE, JR., J. concur.
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).